786 A.2d 961

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kenneth BROWN, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2001.

Decided Dec. 31, 2001.

Reargument Denied Feb. 26, 2002.

274

John P. Cotter, Philadelphia, for Kenneth Brown.

Catherine, Philadelphia, Robert A. Graci, Harrisburg, Anya K.R. Rosen, Regina M. Oberholzer, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

Kenneth Brown (Brown) appeals from the Judgment of Sentence of the Court of Common Pleas of Philadelphia County (trial court) that sentenced him to death following a penalty hearing.[1] After reviewing the claims raised by Brown, we affirm the sentence of death.

## FACTS AND PROCEDURAL HISTORY[2]

In August of 1993, Valerie Phillips (Phillips) and her two sons, eight-year-old Rahim and three-year-old Rafael, lived in a second floor apartment at 2238 Page Street in Philadelphia. Brown, Phillips' boyfriend, had resided with them since early July of 1993. At approximately 10:00 p.m. on August 3, 1993,

---

1. Brown had been tried and convicted of first-degree murder and other offenses on February 17, 1995. The jury thereafter sentenced him to death, but this Court vacated the death sentence and remanded the matter to the trial court for a new penalty phase. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998) (*Brown I* ).

2. The facts of the crime as recited herein are taken in large part from the opinion of this Court in *Brown I*, which this Justice authored.

Phillips went to the house of a friend and left Rafael asleep at home with Brown. Rahim was staying with a relative. Phillips stayed out all night and did not return until about 5:00 a.m. the next morning.[3] When she returned, she fell asleep on the floor.

When she awoke at roughly 9:00 a.m., and discovered that the defendant and Rafael were not there, she did not become alarmed at first because she knew that Brown often took Rafael to a local park. However, at approximately 9:00 p.m., after unsuccessfully attempting to locate both Rafael and Brown, she called the police. On August 5 and 6, 1993, the police searched her home and the surrounding neighborhood. At approximately 6:00 p.m. on August 6, 1993, while searching the nearby abandoned Rosen Housing Projects at 23rd and Diamond Streets, the police found Rafael's body in an elevator shaft sixteen to twenty feet under a heavy metal grate. Dr. Bennett Preston (coroner), an Assistant Medical Examiner for the City of Philadelphia, examined Rafael's body at the scene and later conducted an autopsy. He noted bruises on the forehead of Rafael, the back of his head, the left upper abdomen, the right outer abdomen, the left lower abdomen, the side of the liver, abrasions on the left upper back and back of the right thigh, a lacerated spleen, and evidence of bleeding in the abdominal cavity. The skin on Rafael's rectum was completely torn away from his anus, showing that someone forcibly placed a hard, blunt object into his rectum. Rafael had also suffered massive injuries to his colon. All tests for sperm and acid phosphatase, an enzyme found in semen, yielded negative results. The coroner explained that Rafael's injuries and massive bleeding, coupled with the estimated sixty-hour time period that the body was left to rot under the grate, rendered D.N.A.[4] testing impossible.

3. Phillips testified that she had been drinking beer, but she denied using drugs that night.

4. Deoxyribonucleic acid, or D.N.A., is microscopic material in the nucleus of cells that contains genetic information. In some crimes, D.N.A. evidence from bodily fluids can lead to identification of the perpetrator or perpetrators.

The coroner determined the cause of death to be multiple blunt force injuries and the manner of death to be homicide. He opined that the child was alive during the infliction of these wounds and finally fell out of consciousness because of massive blood loss. According to the coroner, the object that was forced into the boy's rectum could have been a broomstick, a penis, or both. A pillow with bloodstains found in Phillips' apartment suggested to the coroner that the boy's face had been shoved into the pillow to stifle his screams.

The police immediately began a search for Brown. From various interviews, they discovered from a neighbor that Brown had been seen knocking on the door of his mother's residence. The neighbor had a brief conversation with Brown, during which the latter cried and told her that he loved his mother and that he would be going to jail. Brown also called his sister and told her that he hurt Rafael but did not want to go to jail. That same morning, he visited his employer and told him that he got himself in trouble and would miss a few days of work. He also asked for his paycheck for the week; the employer denied this request.

On August 7, 1993, police in Atlantic County, New Jersey arrested Brown for an unrelated burglary and incarcerated him there. At the time of his arrest, Brown provided the police with two aliases and a false address and social security number. After Brown and other inmates in the Atlantic County prison saw a news story about Rafael's murder that showed a picture of Brown's face, Brown asked prison officials to separate him from the other inmates because he was afraid they would harm him. Brown asked the prison to contact Philadelphia authorities; he eventually waived extradition and was returned to Philadelphia.

Detectives searched Brown's person and took samples of his hair, saliva, and blood. Detective Ivan Pitt took a statement from Brown, in which Brown admitted that he hit Rafael and might have played a bit too rough with him, but denied any sexual contact with the boy. He claimed that he unsuccessfully attempted to awaken Rafael in the apartment at 6:00 a.m. on August 4, 1993, attempted C.P.R., and when he could not

revive the child, carried Rafael outside. Brown also stated that he left Rafael under the grate because he could not find help and was frightened.

On February 17, 1995, a jury convicted Brown of murder in the first degree,[5] rape,[6] and involuntary deviate sexual intercourse (IDSI).[7] During the sentencing hearing, the prosecutor made a veiled reference to the Bible, indicating that "ancient law" condemned the killing of a child. At the conclusion of the penalty phase, the jury returned a sentence of death, finding that the aggravating circumstances outweighed the mitigating circumstances. The trial court denied Brown's post-trial motions, formally imposed the sentence of death for first-degree murder, and enforced no additional penalty for the rape or IDSI convictions.

In a unanimous Opinion, this Court affirmed Brown's conviction for first-degree murder and IDSI, reversed the rape conviction, and vacated the Judgment of Sentence for first-degree murder because of the prosecutor's reference to a religious writing. In vacating the Judgment of Sentence, we relied upon *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991), in which this Court admonished all prosecutors that reliance on the Bible, or any other religious writing, in support of imposing the death penalty is reversible error *per se* and could subject the prosecutor to disciplinary action.[8] Accordingly, pursuant to 42 Pa.C.S. § 9711(h)(4), we remanded the case to the trial court for a new sentencing hearing.[9]

5. 18 Pa.C.S. §§ 2501(a), 2502(a).

6. 18 Pa.C.S. § 3121.

7. 18 Pa.C.S. § 3123.

8. This Court reversed the rape conviction because we determined that the Commonwealth had failed to produce evidence of rape at trial.

9. 42 Pa.C.S. § 9711(h)(4) provides as follows:

If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing....

On remand, the trial court empaneled a new jury and conducted a penalty hearing over four days from March 29, 1999, until April 9, 1999. The Commonwealth presented witnesses to provide the jury with an overview of the evidence presented at trial and to establish that Brown committed the killing while in the perpetration of a felony. The Commonwealth also presented enlarged slides of the victim to support the testimony of the coroner and depict the brutality of the crime.[10] Brown submitted to the jury the following mitigating circumstances: (1) that he was under the influence of extreme mental or emotional disturbance at the time of the murder; (2) that his capacity to appreciate the criminality of his conduct or to conform his conduct the requirements of law was substantially impaired; (3) his age at the time of the murder (twenty-one years); and (4) other evidence of mitigation concerning Brown's character and record.

On April 7, 1999, a juror walking out of the courtroom at the close of testimony uttered "May God bless you" to Phillips, who was sitting in the gallery. (Notes of Testimony (N.T.) April 8, 1999, page 35.) Family members of Brown saw the juror make the comment and reported it to defense counsel, who promptly informed the court. The trial judge conducted a mini-hearing and questioned the juror, who testified that she had not yet prejudged Brown's sentence and would "keep an open mind" until the close of the hearing. (N.T. April 8, 1999, page 43.)

The jury found three aggravating circumstances: (1) Brown committed the killing while in perpetration of a felony, specifically IDSI; (2) the offense was committed by means of torture; and (3) the victim was a child under twelve years of age. The jury found one mitigating circumstance out of the four proffered by Brown, namely other evidence of mitigation concerning Brown's character and record (the catchall provi-

10. The prosecutor presented these same slides at trial. In his original appeal, Brown alleged that use of these slides at trial was reversible error mandating a new trial on the question of guilt, but this Court held that "the trial court properly weighed the pertinent factors and did not abuse its discretion when it permitted the Commonwealth to display the slides to the jury using a projector." *Brown I*, 711 A.2d at 454.

sion).[11] Accordingly, the jury returned a sentence of death, which Brown promptly appealed to this Court.

## DISCUSSION

### I. Jury Instruction on Torture

Brown first contends that the trial court improperly instructed the jury on the aggravating circumstance of torture by failing to charge the jury that a killing is committed by means of torture where the evidence indicates that the defendant intended to inflict a considerable amount of pain and suffering on the victim, separate and apart from the commission of the killing. The trial court's charge to the jury on torture was as follows:

The Code states that one of the aggravating circumstances may be where the killing is done by means of torture. What is torture? Any time a person is killed it's natural to assume that pain, even substantial pain accompanies the act.

The legislature, in providing that a killing by means of torture is an aggravating circumstance certainly contemplates something more than the expected pain which accompanies every homicide. Torture may be defined as an act of inflicting excruciating pain especially from extreme cruelty or in hatred, revenge, or the like.

For torture to be an aggravating circumstance the pain must be sadistically applied and it must be of some substantial duration. Torture is the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel, manifesting an exceptional depravity or conscious hatred and ill will. It is the intentional infliction of gratuitous violence on the victim or needless mutilation of the victim. It's difficult to precisely define what constitutes torture.

11. The verdict slip indicated that one or more jurors found the mitigating circumstance of "any evidence of mitigation concerning the character and record of the Defendant and the circumstances of his offense. * His character references from upstate." First Degree Murder Sentencing Verdict Slip, No. CP 9311–2466, page 3.

Whether the facts in the case constitute torture is a matter as you determine it. Remember, it's the Commonwealth's burden to prove this aggravating circumstance beyond a reasonable doubt.

(N.T. April 9, 1999, pages 6–7.)

 "When reviewing a challenge to a jury instruction, we must review the charge as a whole." *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280 (2000); *see also Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181 (1996). "An instruction will be upheld if it clearly, adequately and accurately reflects the law. The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law." *Spotz,* 759 A.2d at 1287. A trial court has broad discretion in phrasing its instructions and is permitted to choose its own wording. *Commonwealth v. Hawkins,* 549 Pa. 352, 701 A.2d 492 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998).

In *Commonwealth v. Jacobs,* 556 Pa. 138, 727 A.2d 545 (1999), we approved a jury instruction that stated:

For a person to commit first degree murder by means of torture he must intend to do more than kill his victim. He must intend to inflict unnecessary pain or suffering and he must do so in a manner or means that are heinous[,] atrocious[,] or cruel[,] or show exceptional depravity.

*Id.* at 553. We determined that this charge was adequate to inform the jury of the requirements for proving the aggravating circumstance of torture. *See also Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507, 523 (1999) (instruction upheld where court stated a defendant must "intend to inflict considerable amount of pain and suffering" and that "the pain or suffering was unnecessary or more than needed to effectuate the death of the victim"); *Commonwealth v. Thomas,* 522 Pa. 256, 561 A.2d 699, 709 (1989) (instruction proper that defined torture only as "the intentional infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or cruel manifesting excep-

tional depravity"); *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997, 1006 (1998) (instruction upheld where the court defined torture as the "infliction of considerable amount of pain and suffering on the victim which is unnecessary, hence atrocious or cruel, manifesting exceptional depravity").

Brown argues that the jury charge was erroneous because it failed to inform the jurors that intent to kill is separate from intent to torture and, thus, a reasonable juror could conclude from the instruction that an intent to kill accomplished by an unnecessarily atrocious death is sufficient to prove torture. We disagree. The instruction given by the trial court on torture clearly, adequately, and accurately reflected the law. The court stated that "[t]orture may be defined as an act of inflicting excruciating pain especially from extreme cruelty or in hatred, revenge, or the like." (N.T. April 9, 1999, page 6.) Further, the court informed the jury that "[t]orture is the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel, manifesting an exceptional depravity or conscious hatred and ill will. It is the intentional infliction of gratuitous violence on the victim or needless mutilation of the victim." (N.T. April 9, 1999, page 7.) This instruction clearly conforms to the standard we articulated in *Jacobs* and adequately informed the jury that the intent to torture is more than "just" the intent to kill.

## II. Jury Instruction on Preponderance of the Evidence

■ Brown also claims that the trial court incorrectly instructed the jury on the proper definition of "preponderance of the evidence." He asked for an instruction to inform the jurors that his burden of proving mitigating circumstances by a preponderance of the evidence requires either that the evidence makes the mitigating circumstance "more probable than not" or that the defense has to present evidence to "tip the scales" slightly in favor of finding the mitigating circumstance.

The court gave the following instruction on "preponderance of the evidence" at the beginning of the penalty phase:

The criteria or standard of proof for the Commonwealth's evidence is beyond a reasonable doubt. The defense has a different standard of proof. In the defense, mitigating circumstances must be presented to a preponderance of the evidence, which means that if you look at the scale, all the defense has to do is to tip the scale slightly. If you're familiar with a balance scale, tip it slightly is all that the defense has to do with regard to its standard of proof.

(N.T. April 6, 1999, pages 33–34.)

Remember, it's the defendant's burden to prove the mitigating circumstances by a preponderance of the evidence, that is, by the greater weight of the evidence.

(N.T. April 6, 1999, page 40.)

Before Brown presented his evidence of mitigating circumstances, the trial court re-instructed the jury on the preponderance of the evidence standard as follows:

The next step is for the defense, if it elects to do so, to introduce what we call mitigating circumstances. And I remind you that the standard of proof placed on the defendant by the Rules of Criminal Procedure is the preponderance of the evidence as opposed to beyond a reasonable doubt. And that preponderance of the evidence is by the greater weight of the evidence. The scale is even, and to tip the scale slightly in the direction of the defense is the burden of proof.

(N.T. April 7, 1999, pages 30–31.) Prior to sending the jury to deliberate, the trial court again gave the jury an instruction on the definition of preponderance of the evidence:

By contrast, and you had examples of it, the defendant's obligation is to prove any mitigating circumstances by a preponderance of the evidence. That is, if you take a scale that's even, to tip it slightly is the criteria or requirement for preponderance of the evidence, which, as you can appreciate, is by the greater weight of the evidence.

(N.T. April 9, 1999, pages 3–4.)

I remind you again, and I will continue to do it throughout this instruction, it is the defendant's burden of proving

mitigating circumstances, but only by a preponderance of the evidence. That is, as I told you before, by the greater weight of the evidence and not the burden of beyond a reasonable doubt.

(N.T. April 9, 1999, pages 10–11.)

As we noted above, a jury instruction must be reviewed as a whole and will be upheld if it clearly, adequately and accurately reflects the law. In *Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456 (1998), this Court approved the "greater weight of the evidence" definition of preponderance of the evidence and a "tips the scales" instruction without "more probable than not" language. *See also Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167 (1999) (approving "greater weight of the evidence" as the sole definition of preponderance).

When viewed as a whole, the instructions of the trial court clearly informed the jury about the defendant's burden to prove mitigating circumstances by a preponderance of the evidence and adequately defined that term. Brown's contention, that the court's failure to give his requested "more probable than not" instruction was reversible error, is without merit. Accordingly, we hold that the trial court properly instructed the jury on preponderance of the evidence.

### III. Double Jeopardy

Brown next posits that the United States and Pennsylvania Constitutions bar the Commonwealth from again seeking the death penalty and instead mandate a sentence of life imprisonment. As we have already noted, in *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630 (1991), this Court held that "reliance in any manner upon the Bible or any other religious writing in support of the imposition of the penalty of death is reversible error per se and may subject violators to disciplinary action." *Id.* at 644. Brown argues that the prosecutor's violation of the *Chambers* rule in the original penalty hearing in the case *sub judice* implicates his double jeopardy rights. He relies on *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992), in which we held that:

> [T]he double jeopardy clause ... prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Id.* at 325. Brown is attempting to transplant the double jeopardy prohibition on retrying a defendant into the penalty phase, but he cites to no precedent holding that once a death sentence is vacated, it cannot be reimposed, and no such case exists.

While the prosecutor's references to "ancient law" at Brown's first sentencing hearing constituted reversible error *per se* pursuant to *Chambers*, the remedy is a new penalty hearing, not a bar to the re-imposition of the death penalty. We discussed a similar issue in *Commonwealth v. Lesko*, 553 Pa. 233, 719 A.2d 217 (1998) (*Lesko II* ), *cert. denied*, 525 U.S. 1108, 119 S.Ct. 878, 142 L.Ed.2d 778 (1999). In that case, the defendant was convicted of first-degree murder and conspiracy in the death of a police officer, whereupon the trial court sentenced him to death. On direct appeal, we affirmed the Judgment of Sentence. *Commonwealth v. Lesko*, 509 Pa. 67, 501 A.2d 200 (1985) (*Lesko I* ), *reargument denied*, 509 Pa. 625, 506 A.2d 897 (1986), *cert. denied*, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987). In a subsequent *habeas corpus* proceeding, the United States Court of Appeals for the Third Circuit reversed the imposition of the death penalty, reasoning that improper remarks by the prosecutor during the penalty phase had tainted the jury. *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir.1991), *cert. denied*, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991).

The case was eventually remanded to the trial court, which conducted a new sentencing hearing, again imposing the death penalty. On appeal to this Court, the defendant argued, *inter alia*, that the double jeopardy clause barred re-sentencing and mandated a sentence of life imprisonment. We rejected this claim, holding that although the prosecutor's improper remarks required reversal of the death sentence, "neither the

Third Circuit Court of Appeals nor any other court [had] determined that the prosecutor's misconduct was an intentional attempt to impermissibly prejudice [the defendant]." *Lesko II*, 719 A.2d at 227. We concluded that "the prosecutorial misconduct in [the original penalty phase did] not rise to the level of intentional misconduct and double jeopardy was not, therefore, implicated." *Id.* at 227.

Likewise, in the case *sub judice*, Brown has proffered no evidence that the prosecutor's remarks regarding "ancient law" rose to the level of an intentional attempt to prejudice Brown impermissibly. After reviewing the record in *Brown I*, we find that the prosecutor's statements did not rise to the level of intentional misconduct and, therefore, the second penalty hearing was not barred by the double jeopardy clause.

Moreover, as previously stated, 42 Pa.C.S. § 9711(h)(4) provides as follows:

If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing. . . .

Section 9711(h)(4) clearly states that, where this Court vacates a death sentence for any reason other than that none of the aggravating circumstances were supported by sufficient evidence, the trial court must hold a new penalty hearing. This Court overturned Brown's death sentence because of remarks by the prosecutor, not because the evidence of the aggravating circumstances was insufficient. Accordingly, Brown's second penalty hearing did not violate the Double Jeopardy clause of either the United States or Pennsylvania Constitutions.

## IV. *Life–Size Photographs*

Brown challenges the decision of the trial court to allow the prosecution to show life-size photographs of Rafael's body at the second penalty hearing. Pennsylvania Rule of

Evidence 403 provides: "[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In *Brown I*, we held that "[t]he admissibility of photographs of a crime scene is within the sound discretion of the trial court and only an abuse of the discretion will constitute reversible error." 711 A.2d at 453. In *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203 (1997), we promulgated a two-step test to determine the admissibility of photographs of a victim: "[f]irst a court must determine whether the photograph is inflammatory.... If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Id.* at 216.

Brown argues that the photographs served only to inflame the passions of the jury, that the prejudicial effect of the slides far outweighed their evidentiary value, and that the depiction was needlessly cumulative. Brown presented the same argument to this Court in the original appeal of his conviction. We addressed the claim as follows:

Rafael's murder was truly a horrible, unspeakable crime. Yet, that is the crime for which Brown was on trial, and it is the crime for which Brown was convicted. The photographs of Rafael's tortured and decayed body are indeed unpleasant, as one would expect in a brutal sexual assault and murder of a small child. However, these photographs were probative concerning the element of specific intent to kill. Furthermore, the photos showed the area in which Brown dumped Rafael's body and they corroborated Dr. Preston's testimony and assisted him in conveying the results of the post-mortem examination.

After viewing these photographs *in camera*, the trial court held that they were admissible. In its Opinion, the trial court held that the photographs were potentially inflammatory, but that they were nonetheless admissible because

their probative value outweighed any prejudicial effect they may have had on the jury.

The trial court applied the proper legal test, and held that without the slides, it would have been impossible for a reasonable juror to fully grasp the severity of the wounds inflicted upon the boy. After reviewing the entire record of this case, we conclude that the trial court did not abuse its discretion when it permitted the Commonwealth to introduce these photos.

Moreover, we reject Brown's claim that the slides were inadmissible because the images they projected were "life-size." The Commonwealth presented some of these photographs using a slide projector, and the Commonwealth admits that the projected image of Rafael's body was approximately the same size as his actual body. (The projected image was two and one-half feet high, and Rafael was two feet and nine inches tall.) Regardless, we decline to hold that the Commonwealth is precluded from using projectors to show slides or photographs to the jury. Instead, we hold that the decision whether to permit the Commonwealth to use images projected onto a screen or smaller photographs rests in the sound discretion of the trial court. In this case, Brown's three-year-old victim was so small that the projected picture of his corpse was approximately life-sized. However, this fact alone does not amount to an abuse of the trial court's discretion. Accordingly, we hold that the trial court properly weighed the pertinent factors and did not abuse its discretion when it permitted the Commonwealth to display the slides to the jury using a projector.

*Brown I,* 711 A.2d at 453–454 (internal quotations and citations omitted).

The Commonwealth concedes that the slides are inflammatory. The Commonwealth argues, however, that because the identical slides were admissible at trial for their value as evidence of intent to kill, they are equally probative at resentencing to depict the nature and extent of Rafael's injuries to enable the jurors to determine whether Brown acted with

the intent to torture his victim, rather than "merely" kill him. We agree; the slides were highly probative of Brown's intent to "inflict unnecessary pain or suffering and [that he did] so in a manner or means that are heinous[,] atrocious[,] or cruel[,] or show exceptional depravity." *Jacobs, supra,* 727 A.2d at 553.

Prior to presentation of the slides, the trial court gave the following limiting instruction:

> Ladies and Gentlemen, the Commonwealth is about to call the Medical Examiner who'll testify as to his findings following or during his postmortem examination of the decedent in this case. I remind you again, as I did, as I mentioned during your initial questioning, that some of the evidence that he will present to you, to include photographs, might cause you to become upset or may cause you to be unsettled. You promised you'd be able to keep your passions within due bounds and give the Commonwealth and the defendant a fair, impartial trial. The motivation for this presentation is designed specifically to enhance your ability to appreciate what the charges are against this defendant and not to arouse your passions, and you should not respond to it in any way that would cause you not to be able to be fair and impartial.

(N.T. April 7, 1999, pages 9–10.) The law presumes that the jury will follow the instructions of the court. *Commonwealth v. Travers,* 564 Pa. 362, 768 A.2d 845 (2001) (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352 (1995)).

As we held in *Brown I* that the probative value of the slides to show intent to kill outweighed their prejudicial effect, we here conclude that the use of the slides to show intent to torture outweighs the prejudice suffered by Brown as a result of their introduction. In light of the limiting instruction above-quoted, we hold that the trial court did not abuse its discretion in permitting the Commonwealth to present life-size slides of the victim to the jurors.

## V. Statement of the Juror

 Finally, Brown alleges that the trial court erred in not declaring a mistrial when it was informed that Juror number 12 said "May God bless you" to Phillips. Upon learning of this, the court held the following colloquy with the juror in the presence of the attorneys for Brown and the prosecution:

> The Court: Ma'am, we had you come out here and leave your fellow jurors because it has been brought to my attention that possibly you communicated with some or one of the witnesses in this courtroom. Did you?
>
> * * *
>
> Juror No. 12: Yes, I did.
>
> The Court: When was that?
>
> Juror No. 12: As I was exiting.
>
> The Court: Yesterday?
>
> Juror No. 12: Yes.
>
> The Court: What did you say to her?
>
> Juror No. 12: May God bless you.
>
> * * *
>
> The Court: I'm going to have to excuse you, because there's not supposed to be any contact at all with any of the witnesses or family members. Now, you weren't speaking for the jury as a whole were you, when you said that? Were you speaking for yourself when you said "God bless you"? You were saying you hope God blesses her; right?
>
> Juror No. 12: Yes.
>
> The Court: Or were you saying, we all felt that way and I'm being the spokesperson?
>
> Juror No. 12: Yes.
>
> The Court: That's what you were saying, that they all feel that way?
>
> Juror No. 12: Yes.

* * *

The Court: Ma'am, we have discussed the question that I asked you, and I have decided that you will continue on as a juror. You will follow my instructions, keep an open mind, and will not make up your mind on this case until after you've heard all the evidence and the instructions that I'll give you on the law. Can you do that?

Juror No. 12: Yes.

The Court: Have you made up your mind already that he should be sentenced to death?

Juror No. 12: No.

(N.T. April 8, 1999, pages 34–35, 43.)

■■■ A defendant has the right to have his case heard by a fair, impartial, and unbiased jury and contact among jurors, parties, and witnesses is viewed with disfavor. *Commonwealth v. Winstead*, 377 Pa.Super. 483, 547 A.2d 788 (1988). Brown contends that Juror No. 12's improper statement to Phillips, a witness and the mother of the victim, unfairly prejudiced him. He argues that the trial judge realized this by initially telling the juror that he would have to excuse her, even though he later reversed that decision. Brown relies on *Commonwealth v. Price*, 463 Pa. 200, 344 A.2d 493 (1975) to support his position that the juror's comments indicated prejudice.

In *Price*, a juror visited the crime scene during a break in the jury's deliberations. The juror discussed the visit and his findings with other jurors, prompting the defendant to seek a mistrial. The trial court refused to grant a mistrial, but this Court reversed, holding that "the unauthorized visit could have swayed this one juror toward conviction, and that this juror's new found belief in [the defendant's] guilt could then have powerfully influenced the other members of the jury to convict." *Id.* at 495. Brown's reliance on *Price* is misplaced. In *Price*, the trial court never determined which juror had visited the crime scene and, therefore, never conducted a meaningful colloquy with the juror to determine whether any prejudice had resulted. We determined in *Price* that "significant issues were raised at trial concerning the physical aspects

of the areas visited by the juror." *Id.* at 494. "The juror who made the unauthorized visit was never identified and was not questioned. What influence the visit had on the juror is not and cannot be known." *Id.* at 495. Therefore, we held that it "cannot be said beyond a reasonable doubt, that the unauthorized visit did not contribute to [the defendant's] conviction." *Id.*

"It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907, 917 (1997), *cert. denied,* 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997). In the case *sub judice,* the trial court conducted a meaningful colloquy with Juror No. 12 and determined that she had not prejudged the case. Brown suffered no prejudice from this juror's comment because it did not relate to his sentence, which was the sole issue for the jury to consider. The statement did not indicate the juror's vote; rather it expressed sympathy for Phillips' loss. The jury in a sentencing hearing must assume that the defendant committed the crime and is only responsible for deciding whether the defendant should spend life in prison or be put to death. These are both severe penalties, and Juror No. 12's expression of sympathy is not inconsistent with either choice.

Brown further contends that the juror's response to the questions of the court indicated that the entire jury had discussed the case and the penalty prior to the close of the evidence. The juror's expression of sympathy for Brown, even if shared by all the jurors, did not signal that any member of the jury had prejudged the case. As we stated in *Brown I,* the facts of this case are horrible and unspeakable, and such facts were not in dispute before this jury. Accordingly, we hold that the trial court did not abuse its discretion in denying Brown's motion for a mistrial.

## CONCLUSION

We conclude that none of the claims of error raised by Brown merit relief. There was sufficient evidence to support

the aggravating circumstances found by the jury in imposing the death penalty. After a thorough review of the record, we have determined that the sentence of death was not the product of passion, prejudice, or any other factor. We affirm the sentence of death imposed upon Kenneth Brown. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit, within ninety days, the complete record of this case to the Governor of Pennsylvania.

Justice ZAPPALA files a Dissenting Opinion.

Justice ZAPPALA, dissenting.

I respectfully dissent, as I do not believe the court adequately instructed the jury on the aggravating circumstance of torture as embodied in 42 Pa.C.S. § 9711(d)(8). In *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987), we stated that "[i]mplicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill. There must be an indication that the killer is not satisfied with the killing alone." 523 A.2d at 737.

In comparing the shortcomings of the instruction given in *Nelson*, with an instruction that we approved in *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985), we stated:

> The critical distinction between *Commonwealth v. Pursell*, [ ] and the case at bar is that in *Pursell*, the trial judge gave the jury a charge which contained a sufficiently guiding definition of the word "torture." That charge conveyed to the jurors the idea that the "torture murderer", besides having an intent to kill, has an **additional** specific intent— " 'an intention to inflict pain, suffering or both pain and suffering.' " ... 495 A.2d at 197 n. 13.

523 A.2d at 737 (emphasis in original). We reiterated this principal in *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305 (1996), adding that "[n]either the efficacy of the means employed by a defendant to murder his victim nor the immediacy of death is in itself determinative of the question whether the offense was committed by means of torture." 681 A.2d at 1321. The majority cites to several cases since *Auker*

where we have reviewed the instruction given with approval. As the majority also correctly notes, the trial court has broad discretion in phrasing instructions, and the court may choose its own wording. Additionally, jury instructions must be read and reviewed in their entirety.

I believe, however, that the measuring stick for the propriety of an instruction on torture must remain the principle we stated in *Nelson,* that is whether the instruction clearly informs the jury that the aggravating circumstance of torture may only be found if an **additional and separate intent** to inflict pain and suffering beyond that involved in the specific intent to kill, which is an element of first degree murder. Instead, the majority opinion accurately chronicles this Court's gradual movement away from requiring a jury to find an additional and separate intent element to the torture aggravating circumstance.

I do not believe that the jury instruction on torture given in this case conveys to the jury the requirement of intent, on the part of the defendant, which is separate and additional to that required by the crime of first degree murder.

Because the jury found a mitigating circumstance in addition to other aggravating circumstances, I would remand to the trial court for a new sentencing hearing.