J-A24016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| W.W.H. AND ON BEHALF OF E.R.H., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| M.K., | |
| Appellant | No. 1117 EDA 2014 |

Appeal from the Order Entered March 12, 2014
In the Court of Common Pleas of Bucks County
Civil Division at No(s): A06-2013-62212-A-19

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED SEPTEMBER 11, 2014**

M.K. ("Mother"), appeals from a final protection from abuse (PFA) order entered against her on March 12, 2014, for a period of six months. That order stemmed from a PFA petition filed by W.W.H. ("Father") on behalf of the parties' three year old son, E.R.H. ("Child" or "the child"). We affirm.

On February 21, 2014, Father filed a PFA petition on behalf of Child, alleging that Mother was exhibiting odd and mentally unstable behaviors that placed Child in danger of serious bodily injury. That same day, the court conducted an *ex parte* hearing and issued a temporary PFA order against Mother. That order included a custody provision directing that

_____

[*] Retired Senior Judge assigned to the Superior Court.

Mother could have supervised custody of Child from 10:00 a.m. until 2:00 p.m. on Monday through Friday.

On March 12, 2014, a final PFA hearing was conducted.[1] The court thoroughly detailed the evidence presented at that hearing as follows:

> Father testified that Mother believes she is physically ill. Specifically, he testified that Mother believes she has Lyme Disease, as well as sensitivities to many chemicals and airborne pollutants. Father testified that Mother has [been] treated [by] approximately ten (10) physicians over the past two (2) years for these various ailments. Father stated that these physicians are "cash-only" medical providers located in Texas, Arizona, New Mexico, New York, New Jersey, and Pennsylvania. N.T. March 12, 2014, pp. 10-11.
>
> Father testified that, prior to her removal from the marital home pursuant to the temporary PFA Order, Mother was ordering pressurized oxygen tanks that were delivered to the parties' home…. According to Father, Mother informed him that she needed to breathe "pure oxygen." N.T. March 12, 2014, pp. 12-13.

_____

[1] The trial court notes that,

> [a]t the time of the hearing, both Mother and Father filed Petitions seeking protection for themselves. Prior to hearing testimony, the parties agreed to "stay away" from each other and Father was given exclusive possession of the marital home. Therefore, the sole issue remaining was the Petition filed by Father on behalf of the parties' three-year-old son, E.R.H.

Trial Court Opinion (TCO), 5/12/14, at 2. While in Mother's Pa.R.A.P. 1925(b) statement, she raised an issue regarding the court's purported grant of Father's PFA petition on behalf of himself, she abandons that claim on appeal. Accordingly, we will only examine Mother's issues relating to the PFA order entered against her for the protection of Child.

Father asserted that, for safety purposes, the oxygen tanks had to be placed within a well-ventilated area at least thirty (30) feet from any appliances because of its potential flammability. Despite this warning, Father testified that he found Mother in the kitchen of the marital home using the oxygen next to the stove while she was cooking. Father further testified that, while using the oxygen in the kitchen, the stove was on and the parties' child was fifteen (15) feet away. Father testified that despite asking Mother to turn off the stove while using the oxygen, she continued to do so on numerous occasions while the child was present in the home. N.T. March 12, 2014, pp. 14-15.

Father also testified that Mother removed all of the insulation in their sunroom and replaced it with "natural fibers" because Mother believed the prior insulation was making her ill. Father asserted that thereafter Mother starting knocking down the walls in the sunroom with a "meat tenderizer." Father testified that Mother also placed tin foil around the edges of the floor and the household electronic appliances, and duct-taped the air vents throughout the sunroom to prevent "mold" from being circulated throughout the home. Father testified that there was no evidence of a mold problem in the residence. N.T. March 12, 2014, pp. 16-17.

Father testified that Mother believes the "Smart Meter," which PECO installed outside their home, caused radioactivity that "hurts" her. Because of this, Father testified that Mother purchased a new meter to be placed outside the home despite reassurances from PECO that the "Smart Meter did not cause unsafe levels of radiation." N.T. March 12, 2014, pp. 18-19.

Father also testified that Mother uses "a lot of pills . . . and syringes." Father introduced photographs showing the various pills, supplements, and medicines that Mother had within the marital home. See Father's Exhibit — 2. Father testified that the majority of the pills were easily accessible to their three-year-old son, E.R.H. Father testified that the descriptions on some of the medicines were written in Russian and Mother would receive packages of medicines and pills "four or five times a week." N.T. March 12, 2014, p. 23.

Father asserted that Mother believes their son, E.R.H., is suffering from the same "sickness that she experiences." She has stated to Father that if she does not treat their son with

these medicines the child will never be able to leave the home or go to school. N.T. March 12, 2014, pp. 18-19.

Father testified that their son [is] treat[ed] regularly [by] Dr. Jerry Green, a licensed pediatrician, and according to Father, E.R.H. does not suffer from any illnesses other than a "slight cat allergy." N.T. March 12, 2014, p. 24.

Regarding Mother's belief that their son needs to be medicated, Father testified that Mother has put "charcoal" into a water bottle and given it to their son. Father further testified that he witnessed Mother put an "adult strength, prescription probiotic" into their son's yogurt. According to Father, the label on the medicine stated that it was for "the dietary management of ulcerative colitis." Father testified that it was not prescribed to their son by his regular physician, and their son does not suffer from ulcerative colitis. N.T. March 12, 2014, pp. 28-29.

Father testified that since the Temporary Protection Order was in place, Mother had the opportunity to see E.R.H. from 10:00 a.m. to 2:00 p.m., Monday through Friday. Father asserted that after Mother's visit with the child during the second week after the entry of the Temporary Order, the child arrived home and was behaving erratically. Father testified that the child's eyes were dilated and "he could not control himself." N.T. March 12, 2014, pp. 31-32.

As a result, Father testified that he called the child's nanny, who supervised the visits with Mother. According to Father, the nanny informed him that Mother brought their son "homemade soup" to eat that day which she normally does not do. N.T. March 12, 2014, p. 33.

Father further testified that Mother purchased a tent and moved from the marital home into the backyard. On occasion, Father testified that their son slept outside in the tent with Mother. Father further testified that he did not object to his son['s] sleeping outside in the tent until Mother moved the tent inside a fence that enclosed the parties' swimming pool. According to Father, the tent was approximately 18 inches from the edge of the pool when he found Mother and their son inside the tent. Father testified that their son could not swim, and from that point thereafter he did not allow their son to sleep in the tent with Mother. N.T. March 12, 2014, pp. 35-36.

Mother also testified at the hearing of March 12, 2014. She testified that in 2006 she was diagnosed with Lyme Disease by a doctor from New Jersey. When asked what "sensitivities" she experiences, Mother stated that she is sensitive to "perfumes and chemicals." Mother testified that she was also diagnosed with "sensitivities to mold, and food allergies." N.T. March 12, 2014, pp. 54-55.

Mother testified that she is currently "feeling better" because she is being treated by Dr. William Rea, an "environmental" physician in Dallas, Texas. She testified that Dr. Rea treats her with "pure oxygen" and "an organic diet." N.T. March 12, 2014, p. 56.

Regarding the "Smart Meter" used by PECO, Mother testified that her treating physician believes these meters have "106 times more radiation than the phone . . . so he [the physician] thinks it could harm people." N.T. March 12, 2014, p. 59.

Mother testified that the various medications shown in Father's Exhibit-2 were prescribed by Dr. William Rea because "he thinks [her] immune system was . . . down." N.T. March 12, 2014, p. 59.

Mother testified that she administered charcoal to their child "only a few times when he had diarrhea." Prior to this, Mother testified that she would contact a doctor in Ukraine concerning their child's alleged symptoms. Mother further testified that if their child had diarrhea, "it could be poison by food, and charcoal usually takes out all poison from the body." N.T. March 12, 2014, p. 65.

Regarding her habit of sleeping in a tent outside the home, Mother testified that she did it "for fun" and she wanted to see if she felt better outside the house because of her physical sensitivities. N.T. March 12, 2014, p. 68.

Mother testified that she uses "pure oxygen" and understands that she cannot use it near an open flame. Mother further testified that she used oxygen twice a day for approximately eight (8) weeks. N.T. March 12, 2014, p. 70.

Mother admitted that she underwent a psychiatric evaluation at Philmont Guidance Center, and the report from this Center indicated that she did not manifest any signs of

psychosis. Mother further testified that she would never hurt her son, and he was never in danger when in her care. N.T. March 12, 2014, pp. 72-73.

On cross-examination, Mother testified that during her psychiatric evaluation, she did not inform the physician as to the medications she was taking, however, she asserted that she was only taking "supplements" at the time. Mother stated that she has seen approximately ten (10) doctors regarding her illnesses. Mother also averred that she believes their son suffers from the same symptoms as she does. N.T. March 12, 2014, pp. 76-81.

Regarding the demolition of the sunroom in the marital home, Mother testified that she wanted to add new toxic-free insulation to determine whether it improved her symptoms. N.T. March 12, 2014, pp. 72-73.

After hearing the foregoing testimony, this court rendered its decision, stating the following:

> The focus of the hearing and the object of the hearing, as agreed to by the parties, is this three-year-old little boy []. The narrow view is whether this [c]ourt should, or should not enter an Order protecting him from his Mother….
>
> Many of things which I've heard today are rational and can be explained. For example, Mother believes that she previously had Lyme Disease, although there is some evidence that perhaps she did not. But accepting that she did, it is not unforeseen that that event would cause her behavior to change, because the Father has said prior to that she was healthy.
>
> The fact that she treats with "cash only" doctors and travels around the country is not illegal and has brought no harm to the child...[.] The fact that she believes that she needs oxygen is also something we can accept. What is out of the ordinary, what we consider to be very important, are some of the by-products of her belief that she has these illnesses and these sensitivities. For example, the oxygen is delivered to the home. Contrary to common sense, and what she knows to be correct, she leaves [the oxygen] very close to the kitchen stove. We know that that could cause a potentially explosive situation which will tend to place everyone in that home in harm's way.

She apparently used a meat tenderizer to knock down the walls and replaced the drywall with DragonBoard. We do not believe that she was attempting to save [Father] money by being proactive in home remodeling, especially when that's coupled with her placing shopping bags on the vents of the house.

We find [Father's] testimony to be more credible than [Mother's]. We saw tin foil placed in various locations in the living room. That is aberrational behavior in and of itself. It's not harmful to the child, but it sends a strong message that something is amiss here…[.]

[]Father has testified, and I believe him, that she had a lot of pills and syringes in the house. We saw very close to the stove and on the kitchen counter, what appear to be hundreds of bottles of medicines, some of which may be required to be administered pursuant to a doctor's request or prescription. She leaves these medicines in clear reach of the three-year-old child. They're also, according to Father — we credit his testimony — left in the refrigerator.

She has told Father — and we believe his testimony — that the child needs to be medicated, despite evidence to the contrary that he does not need to be medicated. He's under the care of a pediatrician who finds he suffers from none of the ailments from which Mother suffers.

I'm not a psychiatrist. I'm not a psychologist, but one would think that this seems to be a Munchausen by Proxy. Mother has projected her sensitivities onto the child.

It's a great leap to believe that something in his soup dilated his pupils. On the other hand, it's not a great leap when we believe that nothing had occurred to that child until Mother fed him her homemade soup. We know that Mother has a history of adding items such as charcoal, such as other substances, to his food and water.

…

I am troubled by the fact that the photographs confirm what Father has said; that the Mother has placed a flimsy tent within a few feet of a swimming pool and that Mother did not supervise the child to the degree where she was

vigilant in making sure that he and the tent didn't fall into the pool.

So if you take all of these particulars in the aggregate, what we find is a woman — perhaps not of her own making, but nonetheless, the results are the same — who has placed her son in danger of grievous and serious bodily injury.

I'm not suggesting this is a conscious decision … where [Mother] [is] attempting to harm your child, but it seems apparent to this Court that is the result.

So we find that Father has proven his case under the applicable statute. Mother has failed to prove her claim under the same statute.

TCO at 2-8 (quoting N.T., 3/12/14, at 95-100).

The trial court then granted Father's petition for a final PFA order. The court also directed that the custody order granting Mother supervised visits with Child from 10:00 a.m. to 2:00 p.m., Monday through Friday, remained in effect. N.T. at 100. However, the court ordered that Mother's custody visits "be supervised by Kids First Visitation," and imposed the cost of that supervision upon Mother. *Id.* at 101-102.

Mother filed a timely notice of appeal, as well as a timely Rule 1925(b) concise statement of errors complained of on appeal. Herein, she presents three issues for our review:

I. Did the [t]rial [c]ourt abuse its discretion/commit an error of law when it entered an ex-parte [t]emporary [PFA] [o]rder?

II. Did the [t]rial [c]ourt abuse[] its discretion/commit an error of law when it entered a [f]inal [PFA] [o]rder?

III. Did the [t]rial [c]ourt abuse its discretion/commit an error of law when it limited Mother's time with the parties' child to supervised partial physical custody as part of the [f]inal [PFA] [o]rder?

- 8 -

Mother's Brief at 15.

Before addressing Mother's claims, we note that "[o]ur standard of review for PFA orders is well settled. 'In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion.'" *Stamus v. Dutcavich*, 938 A.2d 1098, 1100 (Pa. Super. 2007) (quoting *Drew v. Drew*, 870 A.2d 377, 378 (Pa. Super. 2005) (citation omitted)).

In Mother's first issue, she challenges the court's entry of the temporary PFA order, arguing that Father failed to meet his burden of proving that Child was in "immediate and present danger of abuse." Mother's Brief at 23 (quoting *Drew*, 870 A.2d at 378). We need not delve further into Mother's argument because we agree with the trial court that Mother's challenge to the temporary PFA order is moot in light of "its expiration prior to the full hearing and the entry of a [f]inal [PFA] [o]rder on March 12, 2014." TCO at 12. While Mother cites *Ferko-Fox v. Fox*, 68 A.3d 917 (Pa. Super. 2013), to argue that this issue is not moot, her reliance on that decision is misplaced. In *Ferko-Fox*, this Court was faced with the question of whether a trial court may issue a temporary PFA order without conducting an *ex parte* hearing. *Id.* at 920. Initially, we noted:

> At the outset, we observe that this issue relating to the propriety of the temporary PFA is moot because the trial court entered a final PFA on November 21, 2011. Nevertheless, we find that this case falls within a recognized exception to the mootness doctrine.

> In **Warmkessel v. Heffner**, 17 A.3d 408, 413 (Pa.Super.2011) (quoting **In re D.A.,** 801 A.2d 614, 616 (Pa.Super.2002) (*en banc*)), we delineated the relevant exceptions to mootness: "This Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court." The case at bar implicates the second exception, *i.e.,* due to the evanescent nature of temporary PFA orders, questions relating to the adequacy of *ex parte* proceedings are capable of repetition and apt to elude appellate review. Indeed, this Court has employed exceptions to the mootness doctrine to review issues stemming from expired PFA orders. **Shandra v. Williams**, 819 A.2d 87, 90 (Pa. Super. 2003) (quoting **Snyder v. Snyder**, 427 Pa.Super. 494, 629 A.2d 977, 980 n. 1 (1993))…. Accordingly, it is proper for this Court to confront the pertinent issue that Husband asserts in this appeal, even though our ruling has no legal force or effect upon the order that granted Wife's temporary PFA order.

**Id.** at 920-921.

Here, unlike in **Ferko-Fox**, Mother does not present a question regarding the temporary PFA order that is "capable of repetition and apt to allude appellate review." **Id.** at 902. Instead, she simply challenges the sufficiency of the evidence to sustain the court's entry of the temporary PFA order *in this particular case*. As noted in **Ferko-Fox**, our ruling on this issue would have "no legal force or effect upon" that temporary PFA order which has already expired. **Id.** at 921. It would also have no applicability to, nor offer any guidance in, future PFA cases. Consequently, we agree with the trial court that Mother's first issue is moot.

In Mother's second issue, she challenges the sufficiency of the evidence to support the court's entry of a final PFA order against her.

> "When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." ... This court defers to the credibility determinations of the trial court as to witnesses who appeared before it.
>
> **Fonner v. Fonner,** 731 A.2d 160, 161 (Pa. Super. 1999) (quoting **Miller on Behalf of Walker v. Walker,** 445 Pa.Super. 537, 665 A.2d 1252, 1255 (1995)). We also note that the preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.,* to tip a scale slightly is the criteria or requirement for preponderance of the evidence. **Commonwealth v. Brown**, 567 Pa. 272, 786 A.2d 961, 968 (2001), *cert. denied,* 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003).

**Raker v. Raker**, 847 A.2d 720, 724 (Pa. Super. 2004).

In particular, Mother maintains that the evidence presented at the final PFA hearing was insufficient to prove that she committed "abuse" of Child, as that term is defined in section 6102 of the Protection From Abuse Act (PFAA), 23 Pa.C.S. §§ 6101-6122. That section reads:

> **"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood.
>
> (1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecution commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

In averring that her conduct did not amount to abuse, Mother first claims that the trial court "specifically acknowledged that the child had, in fact, never been abused, stalked, harassed, or threatened by Mother." Mother's Brief at 29. In the portion of the transcript cited by Mother, the trial court stated, "[t]his is not a case where she has stalked, harassed, or attempted to use physical force, but we can certainly read into the clear intent of the statute that it's for protection by any means, and if it continues, she will cause bodily injury to that child…." N.T. at 100. Contrary to Mother's claim on appeal, the court did not state that Child was not abused; instead, the court explained that while Mother had yet to cause injury to the Child, such injury was foreseeable in light of Mother's conduct.

Mother also claims that the evidence was insufficient to prove "abuse" under the PFAA because "Father's testimony … focused primarily on Mother's health and her treatment of the same." Mother's Brief at 29. She also

emphasizes that Father "claimed that he recorded a video of Mother using the oxygen tanks near the stove[,]" yet Father never produced this video. *Id.* at 30. Mother additionally points out that her "renovations to the sunroom" did not endanger the child, nor did her "banging on the walls with a meat tenderizer…." *Id.* at 30-31.

However, Mother ignores that in determining a PFA order was necessary, the trial court did not rely on Father's testimony regarding Mother's health concerns and her treatment of her own ailments, or on the fact that Mother renovated the sunroom using unorthodox methods. Instead, the court hinged its issuance of a PFA order on Mother's conduct involving the child, namely that Mother "mixed charcoal with water" and gave it to Child; Mother gave Child a prescription, adult-grade probiotic medication, despite that there was no diagnosis of any digestive issues by the child's pediatrician; on several occasions, Mother was discovered using an oxygen tank near the stove while Child was in close proximity;[2] Mother left "medicines, supplements, and syringes around the home in areas easily accessible to the child[;]" and there was evidence that Mother slept in a tent with Child that was placed within 18 inches of the parties' swimming pool, despite that Child cannot swim. TCO at 13-14. The evidence that Mother

_____

[2] The fact that Father did not produce a video of Mother's using oxygen near the stove did not preclude the court from crediting Father's testimony that such conduct occurred.

committed these acts was sufficient to support the trial court's conclusion that Father reasonably feared Mother would cause Child serious bodily injury.[3] The court's mention of Father's additional testimony regarding Mother's conduct which did not endanger the child simply painted a fuller picture of Mother's mental state.

Mother's final argument in support of her challenge to the sufficiency of the evidence is that the court improperly failed to consider that Mother did not intend to harm Child. In support of this claim, Mother relies on *Chronister ex. rel. Morrison v. Brenneman*, 742 A.2d 190 (Pa. Super. 1999), where this Court examined whether a father's use of corporal

_____

[3] Mother also argues that the PFA order should not have been issued because "[t]here was no indication … that the child was bodily injured nor was there any indication that the child manifested a reasonable fear of imminent bodily injury." Mother's Brief at 39. Initially, it would be unreasonable to expect a three-year-old to understand the danger posed to him by Mother's using an oxygen tank next to the stove, adding a prescription probiotic medicine to his food, or by her allowing Child to sleep in a tent close to a pool. In any event, in *Ferri v. Ferri*, 854 A.2d 600 (Pa. Super. 2004), the trial court granted a father's PFA petition seeking protection for his then six-year-old daughter from the child's mother. In concluding the evidence was sufficient to support the court's issuance of a final PFA order, we noted that the six-year-old child herself did not have "to demonstrate she experienced reasonable fear of imminent bodily injury." *Id.* at 604 n.8. Instead, "the party seeking a PFA order must come forward with some evidence of either an injury or reasonable fear of imminent injury." *Id.* (emphasis omitted). Here, Father was the party seeking the PFA order on behalf of Child. His testimony was sufficient to prove that he reasonably feared that Child would suffer serious bodily injury if unprotected from Mother. It was not necessary that the three-year-old child also testify that he feared Mother would seriously injure him.

punishment on his sixteen year-old daughter constituted "abuse" under the PFAA. *Id.* at 192. In concluding that it did not, we noted that the father's intent in striking his daughter was not malevolent or meant "to terrorize" her. *Id.* We went on to state that,

> this is not to say that [the father's] actions, regardless of innocent intent, cannot amount to 'abuse' within the contemplation of the Act. **But clearly an intent is an important element in the equation.**

*Id.*

Based on the above-emphasized language, Mother contends that the trial court was required to assess her innocent intent in determining if she "abused" Child, yet the trial court failed to do so. We disagree. The court explicitly acknowledged that Mother was not making "a conscious decision" to harm Child. N.T. PFA Hearing at 99. Thus, the record demonstrates that the court considered Mother's intent, yet nevertheless concluded that based on her conduct, Father reasonably feared imminent serious bodily injury would be inflicted by Mother upon Child. Therefore, we see no conflict with this case and our decision in **Chronister**.

In sum, Father's testimony, which was credited by the trial court, provided sufficient evidence for the trial court to conclude, by a preponderance of the evidence, that Father reasonably feared that Mother's behavior placed Child in danger of imminent serious bodily injury. Therefore, Mother's challenge to the sufficiency of the evidence to support the entry of a final PFA order is meritless.

In her third and final issue, Mother argues that "the custody order imposed by the [t]rial [c]ourt was an abuse of discretion because the requirements imposed by the [t]rial [c]ourt made it difficult for Mother to actually exercise her custodial rights." Mother's Brief at 40. Mother maintains that the court's requirement that the Kids First organization supervise her visits with Child, and that Mother bear the costs of that supervision, "placed an additional financial obligation on Mother" which "significantly reduced Mother's ability to spend time with the child." *Id.* at 41. Mother contends that "[t]here is no indication that the [t]rial [c]ourt considered the actual cost for this service." *Id.* Thus, she claims that the court abused its discretion in drafting the custody provision of the PFA order and, as such, the order should be reversed.

Our review of the record confirms that Mother did not raise these claims during the final PFA hearing or in her Rule 1925(b) statement. First, at the PFA hearing, Mother did not object when the trial court directed that she assume the costs of Kids First supervision. N.T. at 102. She also offered no argument regarding the cost of that supervision and how it would limit her ability to spend time with Child. While Mother did request that the parties' nanny be permitted to supervise her visits with Child, she did not object when the court rejected that request and stated, "Kids First is a requirement." *Id.* at 103. Thus, Mother's arguments on appeal are waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Additionally, Mother failed to present this claim with sufficient specificity in her Rule 1925(b) statement to preserve it for our review. Therein, Mother declared: "The [t]rial [c]ourt erred in the [f]inal [PFA] [o]rder of March 12, 2014[,] in limiting Mother's time with the parties' minor child to four hours per day of supervised time, weekly on Monday through Friday only." Pa.R.A.P. 1925(b), 4/8/14, at 2 (unnumbered pages). Mother did not mention the financial burden of her having to pay for supervision by Kids First, nor did she contend that it reduced her ability to spend time with Child. Because Mother did not specifically assert these claims, the trial court did not address them in its opinion. Therefore, we conclude that Mother's final issue is waived on this basis, as well. *See* Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/11/2014

- 17 -