J. S27009/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JEAN M. CLERGER, | : | No. 451 EDA 2014 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, January 13, 2014,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0003679-2012

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JUNE 10, 2015**

Jean M. Clerger appeals from the judgment of sentence of January 13, 2014, following his conviction of one count each of sexual assault and aggravated indecent assault.  After careful review, we affirm.

The trial testimony was aptly summarized by the trial court as follows:

> In February of 2012, complainant A. E. was a freshman nursing major at LaSalle University, living with her parents.  In that month, she attempted to use several Internet dating websites to meet a boyfriend, and when other sites did not work for her, tried Craig's List.  She responded to a personal advertisement posted by Appellant, telling him that she was eighteen (18) years old, a nursing major at LaSalle, and lived in Philadelphia.  Appellant responded to her message and they began to communicate, first by email, and then over text message.  In the text messages, A. E. stated to Appellant that if he made a move, she would not stop him, however, she meant kissing or cuddling -- not sex.

---

* Former Justice specially assigned to the Superior Court.

After communicating for two (2) to three (3) weeks via text message, A. E. felt comfortable with Appellant and that she could trust him. In the text messages they had talked about school, A. E. told Appellant her father didn't let her do too much, and when Appellant asked A. E. for a sexy picture, she responded that did not "sext."[Footnote 17] Appellant replied that they were not engaged in "sexting;" they were not talking dirty, he just wanted a "cute pic." Thereafter, they made plans to meet in person at Appellant's house, located at 6227 Oakley Street in the City and County of Philadelphia on March 5, 2012.

A. E. took the bus to Appellant's house on the assumption that she would be able to talk to Appellant and get to know him better. Upon her arrival, however, Appellant took A. E. through the back door into the home, and they sat down to watch TV for a couple of minutes. Appellant then asked A. E. if he could give her a tour of the house, and she agreed. Appellant then took her down to the basement and pushed her onto the bed, asking A. E. if she wanted to have sex. A. E. said "no" and ran upstairs, but Appellant chased her and pushed her down again, yelling. A. E. asked to leave, but Appellant said "no."

A. E. told Appellant she needed to use the bathroom; once she was in the bathroom she tried to jump out of the window, but could not because it was too high and she was afraid of breaking her leg. A. E. went back downstairs and attempted to escape through the back door, only to find it padlocked from the inside. She saw Appellant looking through the back door before he came in and attempted to pull off her pants as A. E. desperately tried to pull them back up. A. E. yelled, "No, stop doing that," but Appellant said that if she gave him oral sex, he would let her leave.

[Footnote 17] To "sext" is to send (someone) sexually explicit photographs

- 2 -

or messages via cell phone. *The Oxford English Dictionary*, Sep. 15, 2014, *available at* http://www.oxforddictionaries.com/us.

A. E. performed oral sex on Appellant, with his penis in her mouth, and Appellant performed oral sex on her by putting his mouth on her vagina and his fingers in her vagina and anus,[Footnote 18] but he still would not let her leave. She did not want to perform these acts, and they were painful, but felt that she had no choice; she was afraid that if she said no, Appellant would force her to have sex with him. Appellant then said that if she wanted to leave, she had to have sex with him.

At that time, Appellant and A. E. were laying [sic] on the floor on a sheet, with Appellant on top of her, holding her legs open with a painful grip. A. E., crying, asked Appellant to stop because he was hurting her, and he told her to shut up. Appellant wore a condom at first, but later removed it. Appellant and A. E. then engaged in sexual intercourse for about five minutes before Appellant finished and let her up. A. E. asked Appellant for a tissue because semen was running down her leg, and Appellant laughed at her. Appellant then unlocked the back door with a key and let A. E. leave.

After A. E. left the house, at approximately 1:27 p.m., Appellant sent text messages asking, "You want to be my girl?" and for A. E.'s Facebook page.

A. E. walked back to the nearest bus stop, where two women saw her crying and asked her what had happened. The women flagged down a passing police officer, Philadelphia Police Officer Joseph Mazzuca, at approximately 1:55 p.m. Officer Mazzuca was on routine patrol with his partner around the corner of Rising Sun Avenue and Levick Street when he saw the two women waving frantically at them. When asked what happened,

A. E. told Officer Mazzuca that she had been raped and that she could tell him the location where it had happened. Officer Mazzuca ushered A. E. into the vehicle and promptly drove to the scene of the crime. Although A. E. appeared quiet, stunned, and shocked, she was able to lead the police officers to Appellant's home. Philadelphia Police Officer Linda Crusemire also responded to Appellant's home with her partner, Philadelphia Officer Timothy Fitzgibbon. She also observed A. E. in Officer Mazzuca's patrol car and noticed that A. E. was very upset and seemed shocked: she was staring, nervous, shaken.

> [Footnote 18] Appellant cross-examined A. E. extensively on these statements, arguing she did not mention Appellant putting his fingers into her anus at the preliminary hearing. At trial, Assistant District Attorney Peter Lim testified that he did not press the complainant during the preliminary hearing about where Appellant had penetrated her because in his experience, the most important thing at the preliminary hearing is to make sure the complainant felt comfortable with him. He stated that to force her to talk about such things was to victimize her again.

Officer Fitzgibbon then went to Appellant to ask him questions about the incident in the house. Appellant said that there was a woman, and that they had had sexual intercourse. Officer Fitzgibbon then conducted a patdown of Appellant and asked him whether there was anything in his pockets. Appellant informed Officer Fitzgibbon he had a used condom in his pocket. When Officer Fitzgibbon realized he did not have a secure container for the condom, he directed Appellant to put the condom back into his pocket. Appellant was wearing a jacket, a shirt, jeans, and no underwear. Appellant was then placed in the back of the car, and once they arrived at Special Victims Unit,

Officer Fitzgibbon informed the detective assigned of the condom so that it could be secured.

At that time, A. E. identified Appellant as the man who had assaulted her, although she did not know him by his real name -- she knew him as "Mark." Police officers then took her to the station to take her statement and have a rape kit performed. Detective Adam O'Donnell of the Special Victims Unit was the assigned detective to the case, and interviewed A. E. at the station. She was emotional, distraught, and a little withdrawn, and seemed very shy. However, A. E. was able to provide Detective O'Donnell with many details about the incident as well as a detailed and accurate description of the home. Detective O'Donnell then applied for a search warrant for the premises of the Oakley Street house, as well as for Appellant's DNA to compare with the rape kit.

Detective O'Donnell was present when the search warrant was executed on Appellant's home. He searched the house, took evidence, and photographed the layout. He took pictures of the bathroom window, where he saw handprints on the screen; however, the prints did not show up in the photograph. A used black condom, green boxer style underwear, proof of Appellant's residence, and a sheet and samples from the sofa cushions were recovered from the Oakley Street house.

Joseph Kelly,[Footnote 19] the sexual assault nurse examiner, collected this forensic evidence through a detailed head-to-toe examination of A. E. to search for cuts, bruises, tears, lacerations, and other injuries. In addition to the head-to-toe exam, A. E. had to lay [sic] on her back for a pelvic exam to search for tears, cuts, or injuries to the vagina. A. E. found this humiliating and painful. Kelly then documented any discoveries along with his observations. He observed A. E.'s demeanor was withdrawn and tearful. A. E. told Kelly that Appellant had grabbed her legs and pushed her down, and held her by the legs. A. E. indicated to Kelly that her

vagina had been penetrated by Appellant's penis and fingers; that her anus was penetrated by Appellant's fingers; that Appellant had performed oral sex on her; and that Appellant had ejaculated in her vagina and possibly on her leg. She was unsure whether a condom had been used.

> [Footnote 19] Kelly is a registered nurse certified in sexual assault examinations. He has conducted at least three hundred ("300") exams over his eleven years as a sexual assault nurse examiner.

Kelly documented patterned bruise marks of handprints on both legs below her knees; he had never seen such a unique pattern of bruising before. A. E. was very tender in her labia majora and minora,[Footnote 20] there were tears below the vaginal area, tenderness in the perineum, tears and tenderness in the anus, with no active pleading [sic]. Oral, vulvar, vaginal, cervical, rectal, and perineal swabs were taken for potential DNA evidence.

> [Footnote 20] The labia majora and labia minora are the other two lips of the vagina.

Counsel stipulated that Adewumi Modupe, an employee of the Philadelphia Criminalistics lab, would have testified that she analyzed the swabs from the rape kit performed by Kelly and that no sperm were observed. The results were logged and samples held for DNA testing. The DNA analyst, Lissette Vega, would have testified that the vaginal swab and perineal swab revealed the presence of Appellant's sperm.

Following the assault, A. E. did not feel that she was sexually attracted to men any longer and is only interested in dating women. She stated this might have had something to do with what happened at Appellant's home.

***

> Claudia Clerger, Appellant's sister, testified in his defense. She testified to Appellant's reputation for being a peaceful, nonviolent person in his community. She described the layout of the family home. She testified that her and Appellant's younger brother Jonas Clerger is severely autistic, and cannot speak, read, talk, or write. He can usually be found in his second-floor bedroom listening to music, or sitting in front of the television rocking back and forth. The padlock on the front and back doors are to prevent Jonas from having access to the outdoors or to other bedrooms.

Trial court opinion, 9/29/14 at 3-9 (citations to the record omitted).

Following a jury trial held August 14-16, 2013, appellant was found guilty of sexual assault and aggravated indecent assault. Appellant was found not guilty of rape by forcible compulsion and involuntary deviate sexual intercourse. Additional charges including false imprisonment and recklessly endangering were **nol prossed**. On January 13, 2014, the trial court imposed an aggregate sentence of 6 to 12 years' incarceration. No post-sentence motions were filed; however, on February 10, 2014, appellant filed a timely notice of appeal. Appellant filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.[1]

---

[1] The trial court notes that appellant's Rule 1925(b) statement was one day late. (Trial court opinion, 9/29/14 at 3 n.16.) However, the trial court addressed the issues raised in its Rule 1925(a) opinion and it is unnecessary to remand. **See Commonwealth v. Thompson**, 39 A.3d 335, 340 (Pa.Super. 2012) ("When counsel has filed an untimely Rule 1925(b) statement and the trial court has addressed those issues we need not remand and may address the merits of the issues presented."), citing

Appellant presents the following issues for this court's review on appeal:

> 1. Did the trial court err in denying Appellant's Motion for Mistrial when the government failed to include in discovery any information regarding an alleged handprint on a window screen recovered from Appellant's bathroom when testimony regarding the handprint was given at trial to corroborate Complainant's testimony?
>
> 2. Did the trial court improperly bar the admission of text messages between Complainant and Appellant when such text messages served to establish Appellant's defense of consent to sexual intercourse and were offered to challenge Complainant's credibility, and the basis of the exclusion was the Rape Shield Law, 18 Pa.C.S. § 3104(a)[?]
>
> 3. Did the trial court err in permitting the improper opinion testimony of Detective O'Donnell when such opinion testimony was referenced in the Commonwealth's closing statement, and usurped the fact-finding power of the jury?

Appellant's brief at 2.

In his first issue on appeal, appellant argues that the trial court erred in denying his motion for mistrial after Detective O'Donnell testified regarding handprints on the screen of the upstairs bathroom window. According to appellant, this corroborated the victim's testimony that she

---

*Commonwealth v. Burton*, 973 A.2d 428, 433 (Pa.Super. 2009) (*en banc*).

considered jumping out the window. Appellant claims that the Commonwealth violated its mandatory discovery obligations by not turning over this evidence prior to trial. Appellant also argues that he was unfairly surprised by the detective's testimony, and the trial court's curative instruction was insufficient to cure the error.

> The standard governing our review of a trial court's refusal to grant a request for a mistrial has been previously well summarized by this Court:
>
>> The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a "flagrant abuse of discretion." *Commonwealth v. Cottam*, 420 Pa.Super. 311, 616 A.2d 988, 997 (1992); *Commonwealth v. Gonzales*, 415 Pa.Super. 564, 570, 609 A.2d 1368, 1370-71 (1992). A mistrial is an "extreme remedy . . . [that] . . . must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial." *Commonwealth v. Vazquez*, 421 Pa.Super. 184, 617 A.2d 786, 787-88 (1992) (citing *Commonwealth v. Chestnut*, 511 Pa. 169, 512 A.2d 603 (1986), and *Commonwealth v. Brinkley*, 505 Pa. 442, 480 A.2d 980 (1984)). A trial court may remove taint caused by improper testimony through curative instructions. *Commonwealth v. Savage*, 529 Pa. 108, 602 A.2d 309, 312-13; *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162 (1981). Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. *Richardson*, 496

> Pa. at 526-527, 437 A.2d at 1165. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference and whether the curative instruction was appropriate. ***Id.***

> ***Commonwealth v. Stilley***, 455 Pa.Super. 543, 689 A.2d 242, 250 (1997).

***Commonwealth v. Bracey***, 831 A.2d 678, 682-683 (Pa.Super. 2003),

***appeal denied***, 844 A.2d 551 (Pa. 2004).

> When the trial court provides cautionary instructions to the jury in the event the defense raises a motion for mistrial, "[t]he law presumes that the jury will follow the instructions of the court." ***Commonwealth v. Brown***, 567 Pa. 272, 289, 786 A.2d 961, 971 (2001) (citation omitted), ***cert. denied***, 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003).

***Commonwealth v. Parker***, 957 A.2d 311, 319 (Pa.Super. 2008),

***appeal denied***, 966 A.2d 571 (Pa. 2009).

> In order to succeed on a ***Brady***[2] claim, a defendant must establish that the evidence withheld was favorable to him, ***i.e.***, that it was exculpatory or had impeachment value; the evidence was suppressed by the prosecution; and prejudice resulted. ***Commonwealth v. Sattazahn***, 597 Pa. 648, 952 A.2d 640, 658 n. 12 (2008). In order to establish prejudice, a defendant is obliged to show that "the evidence in question was material to guilt or punishment, and that there is a reasonable probability that the result of the proceeding would have been different but for the alleged suppression

---

[2] ***Brady v. Maryland***, 373 U.S. 83 (1963).

of the evidence." ***Commonwealth v. James Dennis***, 597 Pa. 159, 950 A.2d 945, 966 (2008) (citing ***Brady***, 373 U.S. at 87, 83 S.Ct. 1194; ***Kyles v. Whitley***, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

***Commonwealth v. Miller***, 987 A.2d 638, 655 (Pa. 2009). "The Commonwealth does not violate [Pa.R.Crim.P.] Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware." ***Commonwealth v. Collins***, 957 A.2d 237, 253 (Pa. 2008) (citations omitted). "It is well established in this Commonwealth that the purpose of the discovery rules is to permit the parties in a criminal matter to be prepared for trial. Trial by ambush is contrary to the spirit and letter of those rules and cannot be condoned." ***Commonwealth v. Shelton***, 640 A.2d 892, 895 (Pa. 1994), citing ***Commonwealth v. Moose***, 602 A.2d 1265, 1274 (Pa. 1992).

Instantly, Detective O'Donnell testified that Commonwealth Exhibit C-5G depicted the upstairs bathroom window. (Notes of testimony, 8/15/13 at 80.) According to Detective O'Donnell, there were handprints on the window screen which did not show up in the photograph. (***Id.*** at 80-81.) On cross-examination, Detective O'Donnell explained, "I didn't realize the photograph did not show it. I saw the handprints. I took the photographs and I assumed that the photographs would show the handprints. They do not." (***Id.*** at 92.) Appellant made a motion for mistrial which was denied. (***Id.*** at 114-117.) However, the trial court issued a

- 11 -

curative instruction to the jury, striking Exhibit C-5G and Detective O'Donnell's testimony regarding the handprints:

> Jurors, at this time I'm going to instruct you to disregard any of Detective O'Donnell's testimony with respect to handprints on the window or the window screen. This is a legal ruling that there is nothing for you to consider, because I'm striking it from the record. As I instructed you in the opening instructions, whenever evidence is stricken from the record that means that there's nothing for you to consider. You shouldn't concern yourselves with this ruling. It's a legal ruling. Just follow my instructions. Don't think about the reasons why. I don't want that to be a distraction to you. I have instructed counsel not to in any way address that issue of handprints on the window or window screen. That is no longer an issue. It's off the table. It [sic] stricken as if its [sic] didn't exist. For that reason, I have also stricken the exhibit labeled C-5G. It has been removed from the poster board.

*Id.* at 119-120.

First, Detective O'Donnell's testimony that he observed handprints on the bathroom window is not exculpatory; rather, it tends to corroborate the victim's version of events. Therefore, failure to disclose this evidence was not a **Brady** violation. Furthermore, there is no indication that the Commonwealth was aware, prior to trial, that Detective O'Donnell observed handprints on the window screen. The handprints did not show up in the photograph. The Commonwealth complied with Rule 573(b)(1)(f) by turning over the photograph prior to trial. There is nothing to suggest that the Commonwealth suppressed any evidence or that this was trial by ambush.

In addition, the trial court issued a thorough curative instruction ordering the jury to disregard Detective O'Donnell's testimony concerning the handprints on the window screen, and striking Exhibit C-5G. The jury is presumed to follow the judge's instructions. **Parker**, **supra**. The trial court did not abuse its discretion in denying appellant's motion for mistrial.

Next, appellant argues that the trial court erred in excluding certain text messages between appellant and the victim based on the Rape Shield Law. The text messages in question were as follows:

> Appellant: No are you a freak?
>
> The victim: Sometimes.
>
> Appellant: Hopefully, it will be only for me.
>
> The victim: U nasty lol.

Notes of testimony, 8/13/13 at 3-4.[3]

> Appellant: Speaking of sexting, whens [sic] the last time u did something.
>
> The victim: Like four months ago. . . .

**Id.** at 4.

The Rape Shield Law provides, in relevant part, as follows:

### § 3104. Evidence of victim's sexual conduct

**(a)** **General rule.--**Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the

---

[3] "LOL" stands for "Laughing Out Loud." (Notes of testimony, 8/15/13 at 27.)

alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3104(a).

Our standard of review of a trial court's ruling on the admissibility of evidence is limited.

A trial court's ruling on the admissibility of evidence of the sexual history of a sexual abuse complainant will be reversed only where there has been a clear abuse of discretion. 'An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.'

*Commonwealth v. Allburn*, 721 A.2d 363, 366 (Pa.Super.1998), *appeal denied*, 559 Pa. 662, 739 A.2d 163 (1999) (citations omitted), quoting *Commonwealth v. Spiewak*, 533 Pa. 1, 7, 617 A.2d 696, 699 (1992).

*Commonwealth v. Burns*, 988 A.2d 684, 689 (Pa.Super. 2009), *appeal denied*, 8 A.3d 341 (Pa. 2010).

The purpose of the Rape Shield Law is to prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim. *Allburn*, 721 A.2d at 366-367. The Rape Shield Law is intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants. *See Commonwealth v.*

- 14 -

> *Riley*, 434 Pa.Super. 414, 643 A.2d 1090, 1093 (1994).

*Id.*

> The text of the statute includes one specific exception to its general prohibition of past sexual conduct evidence, regarding the victim's sexual conduct with the defendant where consent of the alleged victim is at issue and the evidence is otherwise admissible. 18 Pa.C.S.A. § 3104(a). However, via interpretive efforts by the courts of this Commonwealth, the Rape Shield Statute has been found to bow to the following exceptions: (1) evidence that negates directly the act of intercourse with which a defendant is charged; (2) evidence demonstrating a witness' bias or evidence that attacks credibility; and (3) evidence tending to directly exculpate the accused by showing that the alleged victim is biased and thus has motive to lie, fabricate, or seek retribution via prosecution. *Allburn*, 721 A.2d at 367.

*Id.* at 690.

Appellant argues that these messages did not fall within the scope of the Rape Shield Law because they neither elicited specific instances of the victim's past sexual conduct nor did they seek to put the victim's sexual history at issue. (Appellant's brief at 13-14.) We disagree. Clearly, references to whether or not the victim is a sexual "freak" and previous acts of sexting with other people is evidence of past sexual conduct and is inadmissible.

Appellant argues that the text messages were admissible to challenge the victim's credibility, where she testified that she had come to trust appellant and that their relationship was not sexual in nature. (Appellant's

brief at 14.) According to the victim, she thought appellant was a nice person and their texts back and forth were not untoward or sexual. (Notes of testimony, 8/15/13 at 28-31.) However, prior to trial, appellant argued the messages were admissible as evidence of consent and the victim's state of mind. (Notes of testimony, 8/13/13 at 5-6.) Appellant did not argue they were relevant to attack credibility.

Appellant also complains that the Commonwealth "opened the door" to questioning the victim about the excluded text messages when it elicited testimony from the victim to the effect that she thought appellant was "being nice" and that she felt she could trust appellant. On redirect, the Commonwealth questioned the victim about numerous text message exchanges between herself and appellant in the weeks leading up to the incident, including one in which appellant asked for "A sexy picture," and her response was, "I don't do sexting." (Notes of testimony, 8/15/13 at 26.) Appellant argued that this line of questioning opened the door to admission of the previously excluded text messages, including the one in which appellant asked the victim whether she was a "freak," so that the jury would not be misled into believing all of their messages were non-sexual in nature. (**Id.** at 36-37.) The trial court reaffirmed its prior ruling. (**Id.** at 38.)

As the Commonwealth states, its questioning on redirect regarding the text message exchanges was actually in response to appellant's questioning on cross-examination, wherein appellant sought to establish the sexual

nature of some of the text messages. For example, appellant asked the victim about text messages on February 20, 2012, in which appellant asked, "So, if I make a move on you, are you going to stop me[?]" (Notes of testimony, 8/14/13 at 91.) The victim replied, "No," to which appellant answered with a smiley face. (*Id.*) The victim then responded, "LOL." (*Id.* at 92.)

The victim denied that any of the 206 text messages between herself and appellant were sexual in nature. (*Id.* at 93.) Appellant then asked the victim whether she thought messages requesting a picture of her, asking her what she was wearing, and asking if she could spend the night would be considered sexual in nature. (*Id.* at 93-94.) The victim conceded that such queries could be considered sexual. (*Id.* at 94-95.)

On redirect, the Commonwealth questioned the victim about the text messages referenced by appellant on cross-examination, including the one in which appellant asked for "A sexy picture." (Notes of testimony, 8/15/13 at 25-33.) The point of this questioning was to clarify the victim's answers and dispel any possible misimpressions created by defense counsel's questioning on cross-examination. (Commonwealth's brief at 14.) For example, in response to the victim's reply that "I don't do sexting," appellant replied, "It's not sexting. We're not talking dirty. I just want a cute pick [sic]." (Notes of testimony, 8/15/13 at 26.) When appellant asked the victim "What you [sic] going to wear Friday?", the victim's response was "Clothes.

IDK." (*Id.* at 26-27.)[4] When appellant asked about spending the night, the victim answered that they could spend time together during the day; appellant's response was, "Yeah, of course. Thursdays be [sic] the best day for me." (*Id.* at 25.)

Therefore, the Commonwealth's questioning on redirect was simply an attempt to put the text messages in their proper context. The Commonwealth was entitled to respond to appellant's cross-examination in which he implied that some of the text message exchanges were sexual in nature, *e.g.*, when he asked the victim what she was wearing or requested a sexy picture. By eliciting the complete text messaging conversations, as opposed to the fragments cherry-picked by appellant, the Commonwealth was attempting to show that their relationship was not, in fact, sexual in nature. We disagree that the Commonwealth's questioning somehow "opened the door" to admission of the excluded text messages. In addition, we note that appellant was permitted to question the victim about the 206 other text messages, as well as Craigslist's personal ads and online dating pages, in an attempt to establish that she and appellant had a sexual relationship and that she went to his house with the intention of having intercourse. Appellant's defense was not hampered by the trial court's ruling. The trial court did not abuse its discretion in excluding the text messages concerning the victim's past sexual conduct.

---

[4] "IDK" is an abbreviation for "I don't know." (*Id.* at 27.)

Appellant also argues that exclusion of these text messages violated his constitutional right of confrontation. (Appellant's brief at 16-17.) However, this argument was not presented in the trial court; as such, it is deemed waived. Pa.R.A.P. 302(a).

Finally, appellant argues that the trial court permitted improper opinion testimony by Detective O'Donnell, usurping the role of the jury and requiring a new trial. (Appellant's brief at 17-19.) Appellant complains that Detective O'Donnell was allowed to assert his personal opinion on the "ultimate issue" at trial, *i.e.*, whether the victim was raped. (*Id.*) The relevant portion of Detective O'Donnell's testimony is as follows:

> Q. Just a few more questions, detective, about your investigation. At any point in time when you're collecting all this evidence do you ask the victim, [], for her text messages, her phone, or any of the emails that she may have exchanged?
>
> A. No. She mentioned text messages in her interview, but they're not relevant. It doesn't matter what they said prior.
>
> MR. SHUTTLEWORTH: Objection to his opinion.
>
> THE COURT: Sustained.
>
> BY MS. MCNABB:
>
> Q. Did you get a search warrant for the text messages or the postings online?
>
> A. No. I have a lot of cases. I have to manage my time. I look for evidence that's going to prove one way or the other what happened. And to me, in my judgment, it didn't affect

what happened inside the property, that residence.

Q. Why in your opinion –

MR. SHUTTLEWORTH: I'm going to object.

THE COURT: Sustained.

MS. MCNABB: If I can rephrase the question?

THE COURT: Okay.

MS. MCNABB: Specifically, I would ask to inquire from the detective why he a [sic] applied for certain items and not others. Why did they not apply for a search warrant with a judgment on what was revealed. Why did she not ask?

THE COURT: That's acceptable.

BY MS. MCNABB:

Q. Detective, you indicated to the jury you didn't ask her to view the phone or print out the text messages. You didn't ask for a search warrant. Why not?

A. When I look for evidence I'm looking to find out what happened. What happened inside that property. What happened prior to that is not something that I need to know. For example, I investigate domestic rapes where a husband and wife will have consensual sex for years and something happens. What happened prior to that doesn't matter to me. It doesn't change the fact of the rape. Doesn't matter. There's [sic] date rape investigations. Doesn't matter that someone showed up for a date. It doesn't give someone the right to rape.

MR. SHUTTLEWORTH: Objection again.

> THE COURT: Sustained. Jurors, I'll ask you at this time to disregard the last comment that the detective made. It shouldn't be considered as part of your deliberations. It's inappropriate for you to consider. So you should not consider that statement. I'll ask the detective to refrain from any personal opinions.

Notes of testimony, 8/15/13 at 87-90.

Contrary to appellant's argument on appeal, the trial court did not permit improper opinion testimony. In fact, the trial court <u>sustained</u> defense counsel's objections and issued a prompt curative instruction to the jury that they should disregard Detective O'Donnell's testimony. Appellant never moved for mistrial or indicated that the curative instruction was insufficient to cure any potential prejudice. As such, the matter is waived. ***Commonwealth v. Manley***, 985 A.2d 256, 267 n.8 (Pa.Super. 2009), ***appeal denied***, 996 A.2d 491 (Pa. 2010) ("In such a case where the trial court has sustained the objection, even where a defendant objects to specific conduct, the failure to request a remedy such as a mistrial or curative instruction is sufficient to constitute waiver.") (citations omitted).

Appellant also complains that the Commonwealth referenced Detective O'Donnell's improper opinion testimony during closing argument. Appellant did not raise this issue in his Rule 1925(b) statement. Appellant did not assert a claim of prosecutorial misconduct during closing argument.

Appellant only alleged trial court error and referenced Detective O'Donnell's testimony.[5]  Therefore, the issue is waived.  Pa.R.A.P. 1925(b)(4)(vii).

Judgment of sentence affirmed.


Stabile, J. joins the Memorandum.

Fitzgerald, J. concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/10/2015

---

[5] "The court erred when it permitted improper opinion testimony of Detective Adam O'Donnell, over counsel's objections, and such testimony usurped the fact-finding function of the jury.  N.T. Trial Transcripts 8/15/13 at 87-90." (Appellant's Rule 1925(b) statement, 9/12/14 at 2 ¶3; appellant's brief appendix A.)