J-S57010-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| AXEL BARRETO | |
| Appellant | No. 1258 EDA 2014 |

Appeal from the Judgment of Sentence November 14, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004008-2012
CP-51-CR-0004009-2012

BEFORE:  MUNDY, J., OTT, J., and STABILE, J.

JUDGMENT ORDER BY MUNDY, J.:          **FILED DECEMBER 30, 2015**

Appellant, Axel Barreto, appeals *nunc pro tunc* from the November 14, 2013 aggregate judgment of sentence of life without the possibility of parole, imposed after being found guilty of three counts of first-degree murder, four counts of attempted murder, and possession of an instrument of crime (PIC).[1]  After careful review, we affirm.

On appeal, Appellant argues the evidence was "insufficient as a matter of law where there was no evidence that he had a specific premeditated

---

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), and 907(a), respectively.  Specifically, Appellant was sentenced to life without the possibility of parole on each murder count, 10 to 20 years' imprisonment on each attempted murder count, and 2 ½ to 5 years' imprisonment on the PIC count with each sentence to run consecutively.

intent to kill and where [] Appellant legally established a valid self[-] defense." Appellant's Brief at 14. Additionally, Appellant asserts a claim of prosecutorial misconduct based on the Commonwealth's closing arguments. *Id.* at 17. Specifically, Appellant argues the Commonwealth implied he was lying and that he "was picking and choosing additional defense when the evidence was incorrect for the first defense." *Id.* at 18-19. Further, he argues the Commonwealth improperly commented on the truthfulness of Appellant's witnesses and Appellant's failure to present certain witnesses. *Id.* at 19.

Upon careful examination of the certified record, we conclude that the trial court has authored a 22-page opinion that thoroughly and comprehensively addresses Appellant's claims. Accordingly, we affirm on the basis of the well-reasoned December 4, 2014 opinion of the Honorable Rose Marie DeFino-Nastasi. We therefore adopt the trial court's opinion as our own and incorporate it in this judgment order.[2] In the event of further proceedings, the parties shall attach a copy of the December 14, 2014 trial court opinion to any filings.

_____

[2] We express no opinion on the final paragraph of the trial court opinion on page 21, as that specific issue is not raised by Appellant on appeal, and therefore, is not presently before us to review.

Based on the foregoing, we conclude Appellant's issues on appeal are devoid of merit. Accordingly, the trial court's November 14, 2013 judgment of sentence is affirmed.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/30/2015

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :      CP-06-CR-0004008-2012

v. :      CP-06-CR-0004009-2012

AXEL BARRETO :

:

**OPINION**

Rose Marie DeFino-Nastasi, J.

**PROCEDURAL HISTORY**

On November 8, 2013, the Defendant was found guilty after a jury trial, presided over by

Honorable Rose Marie DeFino-Nastasi, of three counts of First Degree Murder, 18 Pa.C.S. §

2502(a), as a felony of the first degree; four counts of Attempted Murder, 18 Pa.C.S. § 901, as a

felony of the first degree; and Possession of an Instrument of Crime (PIC), 18 Pa.C.S. § 907(b),

as a misdemeanor of the first degree.

Following a Death Penalty Hearing, on November 14, 2013, the Defendant was

sentenced to life imprisonment without the possibility of parole for the first degree murder of

Javier Orlandi; a consecutive life sentence without the possibility of parole for the first degree

murder of Joshua Soto; a consecutive life sentence without the possibility of parole for the first

degree murder of Dante Lugo; a consecutive sentence of ten (10) to twenty (20) years for the

attempted murder of Aaron Marrero; a concurrent sentence of ten (10) to twenty (20) years for

the attempted murder of Brandon Hernandez; a concurrent sentence of ten (10) to twenty (20)

years for the attempted murder of Christian Nunez; a concurrent sentence of ten (10) to twenty

(20) years for the attempted murder of Angel Rodriguez; and two and a half (2 ½) to five (5)

years for the PIC conviction, to run concurrently. Notes of Testimony (N.T.) 11/14/13 at pp. 9-10.

On February 7, 2014, Defendant filed a PCRA to reinstate Appellate Rights Nunc Pro Tunc which was granted on April 22, 2014.

On April 24, 2014, a notice of appeal was filed.

On August 25, 2014, Defendant's counsel filed a Statement of Matters Complained of on appeal, pursuant to an order of the court directing counsel to file a 1925(b) statement.

## FACTS

On January 10, 2012, Defendant Axel Barreto opened fire on a car filled with seven unarmed teenage boys who had come to the Defendant's Juniata Park home on the 4000 block of Neilson Street to fistfight one of his stepsons, Benny Torres. N.T. 10/29/13 at 66:4-22. Aaron Marrero (age sixteen), Christian Nunez (age fourteen), Brandon Hernandez (age eighteen), Javier Orlandi (age fourteen), Joshua Soto (age fourteen), Dante Lugo (age fourteen) and his brother, Angel Rodriguez (age fifteen) were all occupants of the vehicle and members of a teenage gang which called itself Krazy Ass Boulz (KAB).[1] N.T. 10/25/13 at 64:7-25; 10/31/13 at 32:7-13. Benny Torres was Christian's classmate and a member of a rival gang, Eric Torresdale Boys (ETB). N.T. 10/29/13 at 34:6-24; 10/24/13 at 160:5-10.

Aaron Marrero was treated for a gunshot wound to the back of his neck and survived. Joshua Soto, Javier Orlandi, and Dante Lugo all died as a result of their injuries. N.T. 10/29/13 at 188:15-19, 208:10-13, 224:12-16.

Aaron Marrero, Brandon Hernandez, Angel Rodriguez, and Christian Nunez testified to the events leading up to the shooting. On the night of the crime, the seven boys drove to Juniata

---

[1] Different Commonwealth witnesses referred to KAB as meaning Kissing All Bitches or Krazy Ass Boulz or Kick Ass Boulz. N.T. 10/24/13 at 126:7-22; 10/28/13 at 34:4-25.

Park, spray-painted KAB on a fence, and took a photo in front of it. N.T. 10/25/13 at 153:6-15. In the photo, the boys made a "K" with their hands. *Id.* at pp. 156-57. Christian posted the photo on Facebook. The Defendant's stepson, Benny, commented on the photo: "Nowadays people just don't know how to act. R.S." *Id.* at 157:6-12.; 10/29/13 at 43:19-21, 82:13-19. 129:16-21. Christian testified that R.S. stands for "real shit." *Id.* at 84:3-11. The comment incited an argument between Christian and Benny on Facebook. The two arranged to meet outside of the Defendant's home on Neilson Street to fistfight. The KAB drove to the Defendant's home. They did not bring any weapons[2] with them. N.T. 10/24/13 at pp. 133-34; 10/25/13 at pp. 12-13.

When the KAB arrived, they observed a male in a grey hooded sweatshirt, later identified as the Defendant, standing on the porch smoking a cigarette. N.T. 10/25/13 at 172:19-25; 10/29/13 at 46:8-14. Javier rolled down the window and said "KAB." *Id.* at 47:3-6; 10/24/13 at 132:19-24. The KAB circled the block in their vehicle. When they returned, the Defendant was no longer outside. Aaron parked in an alley connecting Castor Avenue and Neilson Street. *Id.* at 48:8-14. Christian messaged Benny on Facebook telling him to come outside; Benny replied that he already had come outside. *Id.* at 48:15-22. Christian and Dante exited their vehicle and peeked around the corner at the Defendant's home. *Id.* at 49:2-7; 10/25/14 at 160:19-25. A minivan approached from the opposite end of the alley. Christian and Dante got back in their vehicle. N.T. 10/25/14 at p. 176 The boys prepared to leave. Aaron was driving; Joshua sat in the front passenger's seat; Dante sat behind Aaron; Angel sat to the right of Dante; Christian sat on Angel's lap; Javier sat to the right of Angel and Brandon sat behind Joshua. *Id.* at pp. 177-78; 10/29/14 at 51:6-22.

---

[2] A loose chain was found in the backseat of their vehicle. N.T. 10/24/13 at 113:5-20. Aaron Marrero testified that he used the chain for his ATV and that none of the boys intended to use it as a weapon. *Id.* at 159:2-24.

3

Aaron Marrero testified that the van parked a few feet in front of their vehicle. N.T. 10/24/13 at pp. 138-39. While he was looking at the van "waiting for somebody to get out," he saw the Defendant "coming out of the alleyway." *Id.* at 138:21-25; 139:14-17. The Defendant approached from the right side of their vehicle. *Id.* at 140:14-21. The Defendant took approximately two steps towards their vehicle, "looked right in the front windshield," "lifted up his sweater, grabbed his gun, and just started shooting." *Id.* at 141:3-13; 142:2-9; 145:17-24. The Defendant did not say anything. *Id.* at 142:13-14. He just started shooting at "the front windshield on the bottom right-hand corner." *Id.* at 142:10-12; 146:2-12. When the Defendant pulled out the gun, Aaron "thought he was going to say leave, get out of here or something but he started shooting . . . ." *Id.* at 144:3-12; 146:21-23.

Aaron testified that he drove away as soon as he heard the first shot. He "went straight out [of] the alleyway but on an angle to go around the van" and then "straight out" towards Castor Avenue. *Id.* at 144:13-24. At no point did he try to run the Defendant over. Nor did he try to drive in the direction where the Defendant was standing off to the right of their vehicle. *Id.* The Defendant never moved "from the spot where he was when he began firing." *Id.* at 172:5-8. Aaron testified that he continued to hear shots as he was pulling away. *Id.* at 148:11-13. He heard glass breaking and the other males in the car screaming, yelling, and crying. *Id.* at pp. 147-48. He heard approximately nine (9) or ten (10) shots in total. *Id.* at 149:19-22. Aaron further testified that just before he drove out of the alleyway, the Defendant shot him in the back of his neck. *Id.* at pp. 148-49.

Brandon Hernandez testified that after they parked in the alleyway, he got out of their vehicle and walked to the sidewalk at Neilson Street. N.T. 10/25/13 at pp. 18-20. The van pulled up. He thought there were people in the van and that it was some sort of setup, so he got back in

4

their vehicle. The Defendant approached the r vehicle, took approximately two (2) to three (3) steps, reached for his gun, and started shooting. *Id.* at p. 22; 47:2-6. The Defendant pointed his gun at the right side of their vehicle, into the part of the car where they were all seated. *Id.* at p. 25. The Defendant shot from the front of their vehicle to the back. *Id.* at 24:22-24. Brandon stated that once the Defendant pulled out his gun, Aaron tried to drive off. Since the van was blocking their vehicle from leaving, Aaron had to drive around the van to get out of the alleyway. *Id.* at pp. 25-26. None of the boys said anything to the Defendant. *Id.* at 36:19-14. Aaron never tried to run the Defendant over or drive at him. *Id.* at 36:18-24. Brandon heard the sound of broken glass and gunshots as they drove out of the alleyway. *Id.* at 27:4-9; 49:16-18. He knew that the Defendant continued to shoot into their vehicle as they drove away because he saw Aaron get shot in the back of his neck. *Id.* at 27:6-14.

Angel Rodriguez testified that he saw the Defendant come out from the center of the alleyway, pull a gun from his waist, point it towards their vehicle, and shoot into the front windshield on the passenger's side. N.T. 10/28/13 at pp. 5-7; 14-15. Everyone in their vehicle ducked. *Id.* at 15:12-15. At no point did Aaron try to drive the car in the direction of the Defendant. *Id.* at 16:4-6. As soon as shots were fired, Aaron drove towards Castor Avenue. *Id.* at 17:3-15. Angel continued to hear shots as they drove away. *Id.* While in the alleyway, he never heard the Defendant say anything. *Id.* at 18 6-9. None of the boys said anything to the Defendant. *Id.* at 18:19-11. All of the windows were up in their vehicle. *Id.* at 18:12-13.

At approximately 10:30pm, Philadelphia Police Officer Donyell Thomas was dispatched to Saint Christopher's Hospital in reference to a report of multiple gunshot victims. N.T. 10/24/13 at 90: 7-25, 91:1-11. A radio call for multiple gunshots near Castor Avenue and Luzerne Street was contemporaneously issued. N.T. 10/25/13 at 128:2-16. Officer Thomas

5

testified that when he arrived at the front entrance of the emergency room, he observed a blue Toyota Corolla covered in bullet strikes and filled with "pools of blood." *Id.* at 90:15-25. Officer Timothy Miller similarly testified that the vehicle had "multiple gunshot holes in the back window, passenger's side of the vehicle and front window, a large amount of blood in the backseat and some blood in the front seat." *Id.* at 130:3-13.

Philadelphia Police Officer James Martin testified that at approximately 10:30pm, he received a radio call for a report of gunshots in the area of Castor Avenue and Luzerne Street. N.T. 10/24/13 at 252:6-14. When he arrived at the scene, he smelled gunpowder in the alleyway. *Id.* at pp. 253-54. Officer Martin left the scene and drove to Saint Christopher's Hospital. Once there, he spoke with Aaron Marrero who stated that "he had driven to that area of Castor and Luzerne because one of his friends was having a problem with a male known as Benny Torres and that somebody shot at them and he felt something and drove away." *Id.* at pp. 258-59.

Philadelphia Police Officer Timothy Stephan testified that when he arrived at the crime scene, he observed multiple spent shell casings just inside of the alleyway in the rear of 4000 Neilson Street. N.T. 10/28/13 at 95:19-25. While securing the scene, he received a radio call for a person with a gun inside of the property at 4030 Neilson Street. Once at that location, Officer Stephan was met by a Hispanic female, Maria Esquilin, and several juvenile children, including Benny Torres. *Id.* at 96:10-19.

Officer Brian Stark of the Philadelphia Crime Scene Unit testified that two (2) copper jacket fragments and ten (10) 9 millimeter Luger fired cartridge casings (FCC) were collected from the rear driveway of 1511 East Luzerne Street. N.T. 10/28/13 at 148:10-25; 151:3-14.

One (1) Winchester 9 millimeter Luger FCC was collected near the garage door of 4032 Neilson Street, approximately seven (7) feet from the Defendant's garage. *Id.* at pp. 137-38; 151:3-14; 218:20-25.

During inspection of the vehicle, one (1) 9 millimeter Luger FCC was recovered from the front passenger seat. N.T. 10/28/13 at 153:10-14, 166:19-23; 10/30/13 at 57:7-12. Two (2) copper jacket fragments were recovered from under the front passenger seat. N.T. 10/28/14 at 195:22-25, 196: -10. Both fragments had a white powder-like substance attached, consistent with having come in contact with glass. N.T. 10/30/13 at 56:19-25, 57:7-25; 58:1-13.

Officer Stark testified to the bullet holes on the vehicle. N.T. 10/28/13 at pp. 187-201. The rear windshield and backseat windows of the vehicle were tinted. *Id.* at 153:5-14. The rest of the vehicle was not. *Id.* The vehicle had six (6) bullet holes: one in the hood; one in the lower corner of the front windshield on the passenger's side; two in the rear windshield; one in the right backseat window; and one in the right backseat vent window. The hole in the hood of the vehicle was angled toward the steering wheel. *Id.* at 153:18-25. This indicated that the shot was fired from the right side of the vehicle. *Id.* The hole in the front windshield corresponded to a hole in the dashboard. *Id.* at pp. 171-72. The hole in the lower right corner of the backseat window matched a hole near the shoulder area of the front passenger seat. *Id.* at pp. 178-79. Multiple strike marks were observed on the right side of the vehicle. *Id.* at p. 193.

Police Officer Norman DeFields from the Firearms Identification Unit of the Philadelphia Police Department testified to the evidence recovered from the bodies. One (1) bullet core and two (2) bullet jackets with white powder were recovered from Dante Lugo's brain. The white powder was crushed glass. N.T. 10/30/13 at 62:5-25, 63:20-25, 64:1-22. Two (2) full metal jacket bullets with white powder, blood, and tissue were recovered from Joshua Soto's right

7

chest and left humerus respectively. *Id.* at 65:17-25, 66:1-13, 67:1-6. One (1) bullet jacket was recovered from Javier Orlandi's right back, and one (1) bullet core with white powder, blood and tissue was recovered from his left anterior neck. *Id.* at 68:11-25, 69:1-25, 70:1-10.

The Medical Examiner, Dr. Edwin Lieberman, testified to the findings of the postmortem examinations. Joshua Soto died of a gunshot wound to the right side of his back. N.T. 10/29/13 at 207:4-10. Based on the trajectory of the bullet, the business end of the gun would have been slightly behind him, off to the right side, and aimed slightly down. *Id.* at 192:17-25. A second gunshot wound to his humerus was observed. *Id.* at 194:24-25, 195:2-9. Javier Orlandi died as a result of a gunshot wound to his back. *Id.* at 221:25, 222:2. The business end of the gun would have been slightly behind him and off to the right side. *Id.* at 217:2-11. Dante Lugo died as a result of a gunshot wound to his head. *Id.* at 234:21-22. The business end of the gun would have been behind him, aimed forward, so that the bullet entered the back of his head and passed in a forward direction. *Id.* at 233:15-22.

Detective Sean Mellon of the Philadelphia Police Homicide Unit, Fugitive Squad testified that on January 11, 2010, he received an arrest warrant for the Defendant. N.T. 10/30/13 at 94:17-25. The arrest warrant culminated in the development of some information that the Defendant was staying at the Knights Inn in Trevose, Pennsylvania." *Id.* at 92:17-25. Detective Mellon and United States Marshalls went to the hotel. They knocked and announced their presence. The Defendant and a Hispanic female looked out the window of their room. *Id.* at pp. 95-96. Detective Mellon entered the room. After a brief struggle, the Defendant was taken into custody. The Hispanic female, later identified as Carol Diaz, was also taken into custody. *Id.*

The Defendant presented a justification defense. The complaining witnesses conceded that problems between the KAB and ETB started in the summer of 2011. N.T. 10/29/13 at pp.

8

34-35. Angel and Christian testified that in June 2011, their friend Nico was jumped by Benny, his cousin J.R., and other members of the ETB. N.T. 10/25/13 at pp. 161-71; 10/29/13 at pp. 34-42. On the day of that incident, Nico's mother drove some of the KAB to the Defendant's home.[3] When they arrived, J.R. and other members of the ETB were standing outside. The KAB got out of their vehicle and the boys started to fistfight. N.T. 10/25/13 at 166:13-16. Christian and Angel testified that the fight ended when Maria Esquilin, the Defendant's wife and Benny's mother, came out of the house swinging a 2-by-4. *Id.* at pp. 40-41; 10/25/13 at 168:3-15.

The Defendant's wife testified on behalf of the defense. Ms. Esquilin testified that on the day of the June 2011 fight, she heard her neighbor scream her name. N.T. 10/31/13 at 41:6-15. When she looked outside towards Lycoming Street, she saw J.R. surrounded by a group of people trying to fight him. There were "more than twenty kids and adults." *Id.* at 45:2-3. Ms. Esquilin yelled for J.R. to run. She testified: "When I seen him [J.R.] run, he passed by me. I ran right behind him and all I see was all of these kids on top of all of these porches trying to hit my nephew [J.R.] and one of my sons [Benny] was outside." *Id.* at 42:14-20. The KAB followed J.R. to Ms. Esquilin's porch. The boys continued to fight. Joshua hit Benny. *Id.* at pp. 42-43; 84-85. Christian broke one of their windows. *Id.* at pp. 46-47. Ms. Esquilin testified: "I went up the steps. I got on the porch . . . I grab the 2-by-4 and I started swinging at everybody on the porch . . ." *Id.* at 45:12-15. The Defendant "came out and he tried to separate [the fight] . . . he pushed the kids out from my porch and that is when the cops came." *Id.* at 47:12-15.

Ms. Esquilin further testified that she heard that on December 27, 2011, the KAB "were on Erie and Torresdale showing a gun, that they wanted to shoot my son [Benny]." *Id.* at 53:2-5. This prompted Ms. Esquilin to call Benny's school. *Id.* at pp. 126-27.

---

[3] Christian testified that Joshua, Angel, and he drove to the Defendant's home. N.T. 10/29/13 at 37:3-11. Angel testified that Dante, Joshua, Javier, Christian, Nico, Joseph and he drove to the Defendant's home. N.T. 10/25/13 at 162:3-25.

The Defendant took the stand at trial. He testified about multiple incidents involving Benny and the KAB. On the day of the June 2011 fight, the Defendant, his wife, and other family members were sitting on their porch when a neighbor yelled that J.R. was being chased by a group of people. N.T. 1/1/13 at 58:11-22. The Defendant testified: "[B]etween 10 and 12 kids . . . four (4) older women . . . [and] a couple older males" "started overcrowding the front of our house, to the steps, neighbors' porches, next-door neighbor's porch, jumping on their porch, trying to get into our house to hit the kids and things like that." *Id.* at 59:7-24. The Defendant went into their house and told his stepchildren to stay inside. *Id.* at 60:3-9. When he came back outside, Ms. Esquilin had "a 2-by-4 and started swinging." *Id.* at 60:10-19. The fight ended as the police arrived. *Id.* at 60:20-24.

The Defendant testified that around Halloween of 2011, he believed that the KAB shot their house with paintball guns. *Id.* at 64:5-14. After that incident, Ms. Esquilin went to Benny's school to complain about Christian Nunez. *Id.* at 64:19-24. For about a about a week-and-a-half to two weeks, the Defendant or his wife had to go every day to pick Benny up from school. *Id.* at 65:4-14.

The Defendant testified that in November or December of 2011: "Benny told [Ms. Esquilin] that they was trying to come to Erie and Torresdale station where you get off the train at and the kids was trying to wait for him there. One of his friends and him seen one with a gun, a kid was trying to brandish a gun out to let them know they had guns and stuff like that." *Id.* at 66:6-20.

The Defendant testified about the January 10, 2012 shooting. At approximately 10pm, the Defendant was smoking a cigarette on his porch. *Id.* at pp. 70-71. He observed a vehicle drive down Neilson Street towards Luzerne Street. The vehicle slowed down when it reached his

10

home. The back windows of the vehicle were tinted. *Id.* at 73:25, 74:2-5. The Defendant assumed the person was a delivery driver or looking for parking. *Id.* at pp. 71-72. The Defendant sat down in a chair on their porch. The vehicle drove by his house and slowed down again. *Id.* at 73:9-22. The Defendant testified: "After it goes by, probably like two to three houses down, the front window gets rolled down and somebody says something but I didn't get to hear exactly what was said because I really wasn't paying no mind at the car." *Id.* at 73:15-22. The Defendant could not see if there were people in the vehicle. *Id.* at 74:6-13.

The Defendant testified: "I finished my cigarette. I go back in the house, close the door, lock the door because it is late at night, as usual. I sit there, start watching TV and probably about another three to five minutes. Benny comes down the steps . . . he looks out the window and he is on the phone with somebody. I don't know who he was talking to and then after that Benny leaves . . . and then after that, [my stepson] Dominic comes down . . . He looks out. He opens the front door but he doesn't open the screen door to go outside to the porch . . . and he just looks out the screen door and says these guys are coming – I see these guys are coming to get Benny again." *Id.* at 74:19-25, 75:2-14. After talking to Dominic, the Defendant "put two and two together that is why the car was driving by so slowly going around the block." *Id.* at 75:21-25; pp. 76-77. The Defendant told Dominic to tell Ms. Esquilin. He then went to get his stepson, Daniel, who was outside in the alley behind their home. *Id.* at p. 76-79. Daniel went inside.

The Defendant walked "two or three houses down" the alley to borrow a gun from his friend, Droop. *Id.* at pp. 79-80. "[He] got the gun off Droop and then went back in the house." *Id.* at 81:3-7. The Defendant testified that the gun he borrowed was a black XD Springfield compact 9 millimeter. *Id.* at 119:6-24. The Defendant testified: "My wife made it down to the basement. She is screaming to Daniel and all of us that they are trying to kill my son, they are trying to kill

11

my son and I told her. I said calm down . . . . am going to go around and see what's going on." *Id.* at 81:9-15.

The Defendant testified: "I started walking up the driveway. When I walked up the driveway, as soon as I get to the corner of my driveway, I didn't notice what was going on and as soon as I turned, the car was just directly right there and my first instinct, my reaction – my intentions is from everybody telling me the car is in the front of the house and I have no recollection that the car was in the back of the house, coming toward the back of my driveway. So my first instinct, I was in shock, knowing the car was there because I had no idea what was going on, and my first reaction was to start shooting at the car." *Id.* at 82:5-15. The Defendant repeatedly testified that his "first instinct was to start shooting at the car." *Id.* at 174:17-22; 176:15-20. In a formal statement to police on January 12, 2012, the Defendant stated: "As soon as I turned the alleyway they was right there in a car. So my first reaction was to start shooting." Commonwealth's (CW) Exhibit, 23.

The Defendant conceded on cross-examination that the young males in the car did not produce a gun, knife, or say anything to the Defendant. *Id.* at pp. 171-72. Irrespective of this, the Defendant immediately started shooting into the hood and lower front passenger side of their vehicle. *Id.* at 172:17-24. He also conceded that when he shot into their vehicle, he saw Joshua in the front passenger seat *Id.* at 178:2-5. On direct examination, defense counsel asked: "When you saw that car, why did you pull it out?" The Defendant responded: "Because I was fearful of not knowing what was going on or what their intention was of coming around to the back of my house. I didn't know what was going on. When I seen the car, there was so many of them in there, I didn't know what they was going to do." *Id.* at 84:9-16. "As soon as I seen the car, I

pulled [the gun] out and directly began to shoot at the car and everything happened in a span of probably no more than eight seconds." *Id.* at 84:22-25.

As their vehicle passed the Defendant and drove out of the alleyway, the Defendant continued to shoot into their vehicle as the Defendant was "backing up." *Id.* at 86:3-12. During cross-examination by the Commonwealth, the Defendant testified:

> Q. Sir, do you have any idea how Mr. Lugo in the rear seat behind the driver was
>
> shot in the back of the head?
>
> A. No.
>
> Q. Do you have any idea how Javie Orlandi was shot in the back while seated in
>
> the backseat, sir?
>
> A. As I heard from the testimony, it was crowded in the backseat.
>
> Q. Sir, you were firing into the backseat as the car was fleeing, weren't you, sir?
>
> A. Yes.
>
> Q. Yes, you were shooting at the car as it was fleeing, weren't you, sir?
>
> A. Yes.

*Id.* at pp. 194-95.

The Defendant recounted that after the shooting, he went back in the house and Droop took the gun off of him and reloaded it. The Defendant then went upstairs to grab his money and narcotics. He came back down, jumped in his sister-in-law's car, and went to her house. He remained there for a little while, and then left to go to the Knights Inn where he remained until his arrest. CW Exhibit, 23.

The Defendant's wife testified about the shooting. Ms. Esquilin testified that Dominic told her that some kids were there to fight Benny. N.T. 10/31/13 at 60:21-25. When she looked

13

outside, she saw a black car in front of their house with the "window down with a gun out." *Id.* at 61:8-12. Ms. Esquilin further testified that there was a whole bunch of kids on the corner of her house. *Id.* at 61:18-22. She started screaming for Dominic and Benny not to go outside. She heard shots. She called 911 and told them, "They are going to shoot my kids. They are going to shoot my kids. Hurry up. They are going to kill my kids." *Id.* at 63:8-14.

Ms. Esquilin screamed for the Defendant who was in the basement of their home. She testified that the Defendant exited their home from the basement door with a black gun. *Id.* at pp. 64-65. Ms. Esquilin testified that she called 911 before the Defendant went outside.[4] *Id.* at p. 65. The Defendant then returned to their house and told her that he would be right back. The Defendant never returned that evening. *Id.* at pp. 66-67. Ms. Esquilin testified that the police came to their house ten (10) minutes after the Defendant left. *Id.* at 67:9-12.

Carol Diaz testified on behalf of the defense. Ms. Diaz stated that she lives on Castor Avenue behind the Defendant's home. N.T. 10/30/13 at pp. 170-72. In a statement to police, Ms. Diaz stated that the Defendant is her boyfriend, but that he is married. *Id.* at 180:12-21. The Defendant and she would meet on her days off and get a room at a motel. *Id.* at 20-23. On January 11, 2010, the Defendant called Ms. Diaz and asked if she could bring him food and cigarettes. *Id.* at 174:6-18. Ms. Diaz took a bus to the Defendant. She arrived at the Knights Inn no more than fifteen minutes before the police arrived. *Id.* at 176:8-20. Ms. Diaz testified that she learned about the shooting on the news. *Id.* at 186:19-25. However, in a statement to police, Ms. Diaz stated that the Defendant told her "that something happened at the corner of the house and it involved a fight between his kids and some other kids. It was some kind of fight over Facebook." *Id.* at 186:13-16.

---

[4] The 911 transcripts reveal that Ms. Esquilin called 911 approximately twenty-seven (27) minutes after the first call to police dispatch reporting gunshots. *Id.* at pp. 176-83.

14

Detective Jeffrey Burke of the Philadelphia Police Department testified that the Defendant was brought into the homicide unit by Detective Mellon and the fugitive taskforce. N.T. 10/30/13 at 106:11-15. The Defendant was advised of his Miranda rights then gave a formal statement. *Id.* at pp. 108-27. The Defendant confessed that he shot and killed Javier Orlandi, Joshua Soto, and Dante Lugo. *Id.* at pp. 118-19.

## ANALYSIS

### Issue I

In his Rule 1925(b) statement, the Defendant contends that there was insufficient evidence as a matter of law to convict him of First Degree Murder because there was no evidence that he had the specific premeditated intent to kill. The Defendant is essentially asserting that the Commonwealth did not disprove beyond a reasonable doubt his justification defense.

"There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Com. v. Morales*, 91 A.3d 80, 87 (Pa. 2014) (citing *Com. v. Markman*, 916 A.2d 586, 597 (Pa. 2007)). The Commonwealth may sustain its burden of proof "by means of wholly circumstantial evidence." *Morales*, 91 A.3d at 87.

To sustain a conviction for first-degree murder, the Commonwealth must prove beyond a reasonable doubt that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. *Morales*, 91 A.3d at 88; 18 Pa.C.S. § 2502(a). The judicially developed phrase "specific intent"

15

to kill may be used interchangeably with the statutory language "willful, deliberate, and premeditated" to express the same concept. *Com. v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000). The requirement of premeditation is met whenever there is a conscious purpose to bring about death. *Com. v. C'Searo*, 352 A.2d 30 (Pa. 1976). In deciding whether to infer specific intent, the jury should consider all relevant evidence, including the words and conduct of the defendant and the attending circumstances. *Com. v. Ash*, 394 A.2d 479 (Pa. 1978). Circumstantial evidence can itself be sufficient to prove any element or all of the elements of first-degree murder. *Com. v. Chamberlain*, 30 A.3d 381, 394 (Pa. 2011). Thus, the requisite specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Com. v. Diamond*, 83 A.3d 119, 126 (Pa. 2013); *Com. v. Rega*, 933 A.2d 997, 1009 (Pa. 2007) *See* N.T. 11/5/13 at 193:11-17.

Self-defense or defense of others is an affirmative defense to a charge of first-degree murder. *Com. v. Rivera*, 983 A.2d 1211, 1221 (Pa. 2009); *Com. v. Simmons*, 475 A.2d 1310, 1313 (Pa. 1984) A claim of self-defense or defense of others (justification) requires evidence establishing three elements: "(a) [that the defendant] reasonably believed that he [or another] was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." *Com. v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012).

"Although the defendant has no burden to prove self-defense . . . before the defense is properly in issue, there must be some evidence, from whatever source, to justify such a finding. Once the question is properly raised, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in [justifiable] self-defense" or defense of

others. *Mouzon*, 53 A.3d at 740 (citing *Com. v. Black*, 376 A.2d 627, 630 (Pa. 1977)). Deadly force is defined as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury." 13 Pa.C.S. § 501.

The Commonwealth sustains its burden of negation if it proves any of the following beyond a reasonable doubt: "that the [defendant] was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the [defendant] did not reasonably believe that [he] [or another] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self [or others] therefrom; or that the [defendant] violated a duty to retreat or avoid the danger." *Mouzon*, 53 A.3d at 740-41 (citing *Com. v. Burns*, 416 A.2d 506, 507 (Pa. 1980)). The Commonwealth need only disprove one of the elements in order to defeat a claim of self-defense or defense of others. *Com. v. McClain*, 587 A.2d 798, 804 (Pa. Super.), app. denied, 598 A.2d 993 (Pa. 1991).

Although the Commonwealth is required to disprove a claim of self-defense, "a jury is not required to believe the testimony of the defendant who raises the claim." *Com. v. Miller*, 634 A.2d 614, 617 (Pa. Super. 1993), app. denied, 646 A.2d 1177 (Pa. 1994). Moreover, where there is evidence from which a jury can reasonably infer malice, the Commonwealth has met its burden of proving beyond a reasonable doubt that the defendant did not act in self-defense or defense of others. *Miller*, 634 A.2d at 617 (citing *Com. v. Hinchcliffe*, 388 A.2d 1068, 1071 (Pa. 1978)).

It is undisputed that the Defendant shot and killed Joshua Soto, Javier Orlandi, and Dante Lugo who were unarmed and retreating. One could not find that the Defendant reasonably believed that he or his family were in danger of imminent death or serious bodily injury from the victims. The Defendant was most certainly at fault for escalating the situation to one where he

17

then fired a weapon. This was a potential fistfight among unarmed teenagers. This adult Defendant introduced a weapon into a teenage dispute instead of defraying it, or at the least, keeping his family and himself in his home and calling the police. Finally, not only did this Defendant fail to retreat, but left his dwelling to purposefully advance on the victims with a deadly weapon in hand. Aaron Marrero, Christian Nunez, Brandon Hernandez, and Angel Rodriguez repeatedly testified that as soon as the Defendant saw their vehicle, he pulled the gun from his waistband and started shooting. They also testified that none of them brought a weapon to the fight; that Aaron never drove towards the Defendant; and that Aaron never tried to run the Defendant over.

Assuming, arguendo that the Defendant believed his family and he were in danger, the evidence was sufficient to support a finding that the Defendant was the initial aggressor. The Defendant obtained a loaded XD Springfield compact 9 millimeter from his friend, Droop. His front door was locked. His backdoor was secured. He did not call 911. N.T. 11/1/13 at pp. 155-57. All the evidence including the Defendant's statement show that the Defendant walked down the alley behind his home, pulled a loaded gun from his waistband, aimed it at a car filled with young males, and fired multiple rounds. *Id.* at 119:25, 120:1-24; 172:20-24, 178:2-5.

There was ample evidence to disprove the Defendant's claim that he was acting in self defense or defense of his family. The Defendant testified: "As soon as they seen me, they tried to take off." N.T. 11/1/13 at 174:18-25. The Defendant continued to shoot into their vehicle as they fled. *Id.* at 180:23-25, 183:19-23, 195:5-10; 10/30/13 at 86:3-7; *Com. v. Bullock*, 948 A.2d 818, 824 (Pa. Super. 2008) (evidence sufficient to disprove self-defense where defendant shot victim while victim was running away); *Com. v. Yanoff*, 690 A.2d 260, 264-65 (Pa. Super. 1997) (evidence sufficient to disprove self-defense where defendant was near his car and could have

18

retreated in complete safety rather than shoot victim in the back as victim was running away). The Defendant admitted that he saw Joshua in the front passenger seat as he shot into their vehicle. *Id.* at 178:2-5. Aaron was shot in the back of his neck. The ME concluded that the business end of the Defendant's gun would have been slightly behind Joshua, Javier, and Dante when they were shot. N.T. 10/29/13 at pp. 192-234. The ballistics evidence, crime scene analysis, and findings of the medical examiner are consistent with the Defendant's statement and the testimony at trial. Therefore, the Defendant's argument is without merit.

## Issue II

The Defendant alleges three instances of prosecutorial misconduct. A prosecutor's comments do not amount to reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Chamberlain*, 30 A.3d at 408; *See Com. v. Chester*, 587 A.2d 1367, 1378 (Pa. 1991) (holding that the defendant was not entitled to a new trial because certain remarks made by the prosecutor "were not a deliberate attempt to destroy the objectivity of the fact finder, but merely summarized the evidence presented at trial with the oratorical flair permitted during argument").

The Defendant asserts that "the Commonwealth's closing argument so inflamed the jury that they could not render a fair verdict where the Commonwealth's attorney gave his personal opinion with respect to the guilt of the Defendant by calling him a liar." There is no evidence in the trial record that the District Attorney explicitly referred to the Defendant as a liar. The relevant portion of the Commonwealth's closing concerned the contradictory testimony of Maria Esquilin. N.T. 10/31/13 at pp. 61, 141. Ms. Esquilin testified that when she looked outside just before the shooting, she saw a black car in front of their house with a gun out the window. N.T.

19

10/31/13 at 61:8-12. In her statement to police. Ms. Esquilin stated that when she looked outside, she did not see anyone. *Id.* at 141:3-10. The Commonwealth argued in closing:

"Barreto gets up there and says that didn't go so well for my wife. I watched it. I sat here and I watched it. So when I take the stand, I better be a little more reasonable when I try to pull the wool over people's eyes. Absurd, absolutely absurd. They are lying about guns. prior guns. It is an attempt to take your eye off the ball. Let's talk about that. Let's talk about an unreasonable belief in self-defense." N.T. 11/5/13 at 116:24-25, 117:2-12.

The trial court addressed this issue in camera. *Id.* at pp.163-65. Furthermore, Pennsylvania courts have refused to award a new trial under similar circumstances. *Com. v. Carpenter,* 515 A.2d 531, 536 (Pa. 1986) (denying relief where the prosecutor referred to the defendant as a "murderer" who "took the stand and lied"): *Com. v. Judy,* 978 A.2d 1015 (Pa. Super. 2009) (prosecutor's assertion that defendant lied did not warrant mistrial); *see Com. v. Hanible,* 30 A.3d 426 (Pa. 2011).

The Defendant next claims "the Commonwealth improperly shifted the burden of proof the [sic] Defendant when he commented on the Defendant's failure to call certain witnesses to trial." *See* N.T. 11/5/13 at 129:9-25, 130:1-2. Comprehensive opening and closing instructions considered in conjunction with the maxim that "the law presumes the jury will follow the instructions of the court" neutralize any potential for prejudice. *Rega,* 933 A.2d at 1016; *Com. v. Brown,* 786 A.2d 961, 971 (Pa. 2001). The jury was thoroughly instructed on the relevant law and the Commonwealth's burden of proof. N.T. 10/24/13 at pp. 11-26; 11/5/13 at 178:6-15. The trial court fully and correctly charged the jury after both sides closed. *Id.* at pp. 173-232. In an abundance of caution, the trial court explicitly addressed this issue:

**The Court**: "You heard some argument by Mr. Conroy regarding a witness, Benny Torres, commenting on him not testifying in this case. The burden is always on the Commonwealth, and the Defense, you heard me say over and over again, has no burden to present any evidence in the case. . ." *Id.* at 228:1-12.

Any possible prejudice that may have arisen in the case was cured by the trial court's instructions. *Simpson*, 754 A.2d at 1272. The Defendant's "failure to object to the instruction indicated his satisfaction with the instruction." *Morris*, 519 A.2d at 378. Moreover, even if the statements were improper, they did not have the unavoidable effect of prejudicing the jury, forming in their minds a fixed bias and hostility toward the Defendant. *Chamberlain*, 30 A.3d at 408. Thus, this issue fails.

Defendant lastly asserts the Commonwealth "mis-characterized [sic] evidence when he said that the Defendant said that they deserved to be bullied." A review of the trial record fails to support this contention. Counsel may be referring to testimony evoked on cross-examination of the Defendant's wife. Specifically, that she admitted to hearing the Defendant say, "They want to act like men, I am going to treat them like men." N.T. 10/31/13 at 186:4-10. The Commonwealth was referring to the Defendant's statement in his closing, in which he argued: "Now, the Government is going to say to you then he executed these young men. He intentionally shot and tried to kill each one of these kids and that was his intent. It was premeditated and that is what he wanted to do and he was going to treat them as men, that comment that he seized on to talk about, whatever that means . . ." N.T. 11/5/13 at pp. 52-53. The Commonwealth was merely reiterating the Defendant's own statement with oratorical flair in his argument. Therefore, the Defendant's claim of prosecutorial misconduct fails.

## CONCLUSION

Based on the foregoing, he judgment of sentence of the trial court should be affirmed.

By the Court:

Rose Marie DeFino-Nastasi, J.

22